NORTH CAROLINA UTILITIES COMMISSION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Public Service Electric and Gas Company, Transcontinental Gas Pipe Line Corporation, Kerr-McGee Corporation, Mobil Oil Exploration, et al., Farmers Chemical Association, Inc., Washington Gas Light Company, General Motors Corporation, Brooklyn Union Gas Company, Intervenors.

No. 80–1219.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1981.
Decided May 20, 1981.

Morton L. Simons with whom Barbara M. Simons, Washington, D.C., was on the brief for petitioner.

Auburn L. Mitchell, Atty., Federal Energy Regulatory Commission, Washington, D.C., for respondent. Robert R. Nordhaus, Gen. Counsel, Jerome Nelson, Sol. and A. Karen Hill, Atty., Federal Energy Regulatory Commission, Washington, D.C., were on the brief for respondent.

Robert G. Hardy, Washington, D.C., with whom Thomas F. Ryan, Jr., David J. Evans and Joseph A. Cannon, Washington, D.C., were on the brief for intervenor, Transcontinental Gas Pipe Line Corp.

Robert D. Haworth, Letitia Taitte, Houston, Tex., Carroll L. Gilliam, Philip R. Ehrenkranz and Craig W. Hulvey, Washington, D.C., were on the brief for intervenors, Mobil Oil Exploration, et al.

Richard G. Harris, Derrill M. Cody, Oklahoma City, Okl., William J. Grove, Sr., Carroll L. Gilliam and Jon L. Brunenkant, Washington, D.C., were on the brief for intervenor, Kerr-McGee Corp.

James R. Lacey, Glen Ridge, N.J., entered an appearance for intervenor, Public Service Electric and Gas Company.

Stephen A. Herman, Trenton, N.J., entered an appearance for intervenor, Farmers Chemical Association, Inc.

Susan A. Low and Gordon M. Grant, Washington, D.C., entered an appearance for intervenor, Washington Gas Light Co.

Edward J. Grenier, Jr., Richard P. Noland, Richard A. Oliver, Washington, D.C., and Julius Jay Hollis, Detroit, Mich., entered appearances for intervenor, General Motors Corp.

Joseph Paul Stevens, Brooklyn, N.Y., entered an appearance for intervenor, Brooklyn Union Gas. Co.

Before WALD, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioner North Carolina Utilities Commission ("NCUC") seeks to vacate, or in the alternative to reverse and remand for further findings, an order of the Federal Energy Regulatory Commission ("FERC" or "the Commission")[1] affirming the Initial Decision of the Administrative Law Judge ("Initial Decision")[2] in the proceedings denominated as FERC Docket No. RP75–51.

This order (hereinafter referred to as "RP75–51 Order") terminated an investigation into the causes of, and possible solutions to, curtailments of natural gas deliveries suffered by customers of Transcontinental Gas Pipe Line Corporation ("Transco") during the 1974–75 winter season, and approved several factual findings reached by the Administrative Law Judge ("ALJ") after consideration of the testimony and exhibits presented to him. Because we find petitioner lacks standing to bring this suit and because the decision to terminate this investigation instituted pursuant to section 14 of the Natural Gas Act ("NGA" or "the Act"), 15 U.S.C. § 717m(a), is committed to agency discretion, we dismiss this case for lack of jurisdiction.

## I. THE FACTS

Transco, a major interstate pipeline, purchases, transports and sells natural gas to distributors in 11 states, including North Carolina. At the time of the events which gave rise to this action, its principal sources of supply lay in the outer continental shelf, an area of small, fragmented reservoirs with relatively short productive lives. During the summer of 1974, it became obvious that Transco's supplies from these sources would fall far short of its original estimates, necessitating curtailments in planned deliveries to its customers. Accordingly, Transco issued its first curtailment plan in September, 1974, projecting a shortfall of supply over contract demand of 28 percent. Transco continued to revise its estimates of available gas supplies downwards in the fall, and contemporaneously issued a series of revisions to its original curtailment projections, increasing projected non-delivery by 30 Bcf.,[3] between October and December of 1974.

On January 8, 1975, the Federal Power Commission ("FPC")[4] invoked its discre-

---

1. Order Adopting Initial Decision and Terminating Investigation, FERC Docket No. RP75–51 (Oct. 26, 1979); Record ("R.") 6982.1; I Joint Appendix ("J.A.") 240.

2. Federal Power Commission ("FPC") Docket No. RP75–51 (June 21, 1977); R. 6855; I J.A. 186.

3. "Bcf." is an abbreviation of "billion cubic feet," a volumetric measure.

4. FERC, established by the Department of Energy Organization Act, 42 U.S.C. § 7101 *et seq.*,

tionary authority under section 14 of the Act [5] to investigate Transco's supply shortage. In its Order Instituting Investigation and Order to Show Cause, Setting Hearing, and Establishing Procedures ("Investigatory Order I"),[6] the FPC outlined five areas of inquiry: (1) "the circumstances for the increased curtailment," (2) "a determination as to the current projections of curtailment for said system," (3) "the adequacy of the gas reserves held or controlled by [Transco]," (4) "the change, if any, in the level of production from such reserves, [and] the effect on deliverability of gas from reserves affected by adverse weather" and (5) "the actions taken to fully reactivate the production from those reserves." [7] Transco and its principal suppliers presented evidence on these matters at FPC hearings held between January and March, 1975, at which time the proceedings were suspended to allow the parties to obtain additional information.

In the spring of 1975, Transco again revised its deliverability projection, this time upward to include 18 Bcf. of gas which it had previously declared unavailable. On July 1, 1975, the FPC issued an Order Amending Prior Order and Broadening Scope of Investigation ("Investigatory Order II") [8] to enlarge the scope of the investigation. The additional areas to be explored were "all facts bearing upon the alleged need for any curtailment by Transco to its customers and also to Transco's efforts to improve deliverability upon its system consistent with its obligations to provide adequate and reliable service to its customers," as well as "all facts bearing upon (1) the enforcement of the provisions of the Natural Gas Act or any rule, regulation, or order thereunder; and (2) remedial measures to be directed by the Commission." [9] In the same order, the FPC removed from the scope of the investigation two of Transco's suppliers, Mitchell Energy and Development Corporation ("Mitchell") and Cities Service Oil Corporation ("Cities Service") pursuant to the request of a Congressional subcommittee conducting a related investigation.[10] In its Order Amending Order and Requiring Report ("Investigatory Order IV"),[11] the FPC limited the scope of its investigation to Transco's 19 largest suppliers in the interest of efficiency "[s]ince the purpose of the investigation is to locate, if possible, additional supplies of gas that can

---

assumed the responsibilities of the FPC on October 1, 1977. This proceeding was transferred to FERC's jurisdiction by the regulation of October 1, 1977, 10 C.F.R. § 1000.1.

**5.** 15 U.S.C. § 717m(a) provides:

The Commission may investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person has violated or is about to violate any provision of this chapter or any rule, regulation, or order thereunder, or to aid in the enforcement of the provisions of this chapter or in prescribing rules or regulations thereunder, or in obtaining information to serve as a basis for recommending further legislation to the Congress.

None of the parties in this action challenge FERC's assumption that the decision to begin an investigation under this section is committed to agency discretion. Indeed, it would be difficult to contend otherwise after the Court's decision in *Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), which holds unreviewable the Interstate Commerce Commission's refusal to institute an investigation pursuant to a stat-

ute substantively identical to section 14, and this court's decision in *General Motors Corp. v. FERC*, 613 F.2d 939 (D.C.Cir.1979), holding unreviewable the Commission's refusal to institute an investigation pursuant to § 5(a) of the NGA, 15 U.S.C. § 717d(a).

**6.** FPC Docket No. RP75–51 (Jan. 8, 1975); R. 6400; I J.A. 45.

**7.** Investigatory Order I at 3; R. 6402; I J.A. 47.

**8.** FPC Docket No. RP75–51; R. 6438; I J.A. 49.

**9.** Investigatory Order II at 1–2; R. 6438–39; I J.A. 49–50.

**10.** *Id.* A subsequent order of the Commission reincluded "Cities Service Oil Corporation and any persons associated therewith, except '... with respect to any facet of the A–76 workover project'" within the scope of the investigation. Order Amending Prior Order of July 1, 1975 ("Investigatory Order III"), FPC Docket No. RP75–51 (Aug. 1, 1975); R. 6443; I J.A. 52.

**11.** FPC Docket No. RP75–51 (Aug. 8, 1975); R. 6455; I J.A. 56.

be brought on stream prior to the commencement of the coming heating season." [12]

After an extensive investigation in which seven people spent six weeks in the field, the FPC staff submitted a report concluding that:

in every case, the inability to satisfy the contract requirements was caused by a combination of mechanical and water problems and/or the inability of the wells to produce due to depletion. Thus, of the DCQ [daily contract rate] rate schedules/fields investigated, it is the conclusion of the technical staff that there were no companies that could not satisfactorily account for not making their respective DCQ. . . .

FPC Report on Investigation and Audit of Transco Producer-Suppliers ("Staff Report"), FPC Docket No. RP75–51 at 5–6; R. 4695–96; II J.A. 5–6. The Staff Report further concluded that there was no evidence of any "shut-in reserves being 'withheld from the market' or that there are any wells capable of delivering in excess of current levels which can be legally or in some cases economically produced." Staff Report at 6; R. 4696; II J.A. 6 (footnote omitted). This report served as the cornerstone of the hearings which reconvened before an ALJ in February, 1976.

The ALJ issued his Initial Decision in June, 1977. *See* note 2 *supra.* The ALJ substantially adopted the factual conclusions of the Staff Report, which he quoted at length in his opinion. He thereby vindicated Transco's actions during the crisis— he found that the curtailments were necessary and that Transco had not attempted to manipulate gas supplies for its own profit— but did not go so far as to conclude that Transco or its suppliers were free from blame for the conditions which led up to the crisis. Indeed, the opinion notes that "there may have been some lack of diligence in the past in improving gas supplies and some bad management decisions on the timing of offshore repairs[.]" [13] However, the ALJ rejected the remedial measures proposed by the FPC staff and NCUC in light of Transco's "aggressive" efforts to increase future deliverable supplies of natural gas [14] and "Ordered, subject to review by the Commission, that this Investigation is terminated." [15]

NCUC and the FPC staff filed Exception Briefs to this initial decision, arguing that the judge should have recommended remedial actions.[16] The Commission, however, affirmed the ALJ's decision in a two page order issued in 1979, noting in a footnote that Transco's supply situation had vastly improved by 1978 and that the 1979 projections were even higher. RP75–51 Order; R. 6982.1; I J.A. 240. NCUC filed an application for rehearing; when the Commission took no action upon it for the statutorily designated time period, NCUC petitioned for review by this court.

## II. THE ISSUES

NCUC argues before this court that the RP75–51 Order should be vacated or reversed and remanded for three reasons. First, NCUC contends that the Commission was required to dismiss the investigation as

---

12. Investigatory Order IV at 2; R. 6456; I J.A. 57.

13. Initial Decision at 6; R. 6860; I J.A. 191.

14. The ALJ noted that Transco's management changed in October, 1974, and that the new chief executive officer had instituted an extensive and varied program to generate new sources of gas. Initial Decision at 11–12; R. 6865–66; I J.A. 196–97.

15. Initial Decision at 13; R. 6867; I J.A. 198.

16. The staff advocated "clarifying and resolutely enforcing the certificate obligations of both producers and pipelines," Brief on Exceptions of the Commission Staff, R. 6882.10; I J.A. 207, while NCUC advocated requiring Transco to meet its certificated obligations under threat of sanctions, restructuring the certificate process to ensure that new sources would be dedicated to high-priority uses, amending FPC regulations to impose meaningful delivery obligations on certificated producers, and sanctioning Mitchell for obstruction of the investigatory process. Brief on Exceptions for State of North Carolina and NCUC, R. 6897–98; I J.A. 222–23.

moot because its decision to terminate the investigation and affirm the ALJ's findings with respect to Transco's and its suppliers' behavior was based on Transco's improved performance in the post–1977 years rather than the factual record underlying the ALJ's Initial Decision. Second, NCUC pleads in the alternative that even if the appeal is not required to be dismissed as moot, the findings made by the ALJ and adopted by the Commission were incomplete and unsupported by substantial evidence.[17]

Respondent FERC and the intervenors, Transco and Public Service Electric and Gas Company, et al. ("PSEG"),[18] argue in their main brief that the investigation is not moot, that the order terminating it was supported by substantial evidence, and that in any case, NCUC has no standing to bring the suit because it is not a party "aggrieved" by the Commission's order. FERC additionally contends that its order terminating the investigation is not subject to judicial review, but is a decision committed entirely to agency discretion.

In a post-argument memorandum to the court, intervenor Transco changed its position on the aggrievement issue, and argued for the first time that this court should review the merits of the Commission's order.[19]

### III. MOOTNESS

The threshold question before this court is whether the Commission's order was moot, and therefore should be vacated in accordance with the doctrine enunciated in *A. L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 329–30, 82 S.Ct. 337, 340–41, 7 L.Ed.2d 317 (1961), and followed by this court in *Tennessee Gas Pipeline Co. v. FERC*, 606 F.2d 1373, 1382 (D.C.Cir.1979). Petitioner argues that both the factual and policy judgments of the ALJ were affirmed by the Commission not because they were correct, but because the investigation had been rendered unnecessary, or "mooted," by the "sharp change of circumstances . . . between initiation of the investigation and its termination five years later," namely, the end of the "gas crisis" and Transco's need to curtail deliveries. Brief for Petitioner at 9–10. Respondent and intervenors argue that the end of the gas crisis did not end the utility of ascertaining its causes and possible preventive measures, and thus the investigation was not rendered moot. In its reply brief, the petitioner contends that this response "misapprehend[s]" the mootness argument: that while "[w]e have at no time contended that the Commission was required to vacate the proceeding as moot if a determination on the merits would serve some appropriate purpose . . . [the Commis-

---

**17.** In particular, NCUC complains about FERC's failure to make specific findings regarding the cause of "the unusual *depth* of curtailment on the Transco system," Brief for Petitioner at 16 (emphasis in original), and three specific factors that had allegedly caused the increased curtailment:

(1) a workover, requiring a shut-in of production, during the winter season by Cities Service Oil Company to repair its wells in the South Brazos A–76 Field,

(2) Mitchell Energy Company's delay in bringing its production at High Island Block 22–L onstream until after the winter season, and

(3) the alleged unavailability of offshore drilling rigs to bring nonproducing wells back into production.

*Id.* at 17. It also argues that the findings that Transco's new management reversed any previous lack of diligence in maintaining an adequate gas supply, and that its old management had not made " 'any deliberate attempt to err

on the low side in making and revising supply estimates' " were not supported by substantial evidence. *Id.* at 19–20. Because we dismiss this case for lack of jurisdiction, we express no opinion on the merits of these arguments.

**18.** The PSEG brief represents the interests of Mobil Oil Exploration and Producing Southeast, Inc., Mobil Producing Texas and New Mexico, Inc., and Kerr-McGee Corporation.

**19.** Though Transco "is unable to anticipate in what Commission proceeding or proceedings, if any, North Carolina might seek to attack the Commission's findings and conclusions in Docket No. RP75–51," it "submits that it is time to lay to rest once and for all the unfounded allegations of wrongdoing [as] . . . . [t]here is nothing to be gained by postpone[ment.]" Memorandum of Intervenor Transco in Response to the Court's Inquiry at Oral Argument at 1–2.

sion's] stated reliance on the change in Transco's supply situation during the period of Commission inaction was improper . . . if that is what the Commission intended in the order here under review[.]" Reply Brief for Petitioner at 9. However, after careful thought, we have come to the conclusion that it is petitioner who mislabelled, if not misapprehended, the "mootness" argument.

Petitioner does not argue—in fact it contends just the opposite—that a determination of the factual issues involved in the investigation has been rendered unnecessary by the passage of time or that the factual findings reached by the ALJ and affirmed by the Commission have no collateral effects on the rights of the parties in other administrative and judicial actions. Rather, petitioner's argument seems to be that the Commission adopted the controversial findings for an improper reason—its reliance on the "footnote 5 data." Footnote 5 of the RP75–51 Order "take[s] official notice of Transco's vastly improved supply situation in the past several years as reflected in its Form 16 filings." RP75–51 Order at 2 n.5; R. 6983; I J.A. 241. Petitioner argues that this footnote was the Commission's only "independent rationale for its action" of "'adopt[ing] unchanged the Initial Decision,'" indicating thereby that instead of reviewing the ALJ's decision on its merits, the Commission affirmed it because "there was no point to continuation of the now-stale investigation of supply on the Transco system[.]" Brief for Petitioner at 13. If the Commission was not going to review the ALJ's decision on the merits, petitioner argues, the Initial Decision

should have been vacated or the proceedings terminated as moot rather than affirmed *precisely because the issues involved still had possible collateral consequences.* In short, petitioner does not appear to dispute the continued existence of a controversy between itself and the Commission, but rather argues that the Commission decided the dispute incorrectly. This boils down to a "substantial evidence," rather than a "mootness," attack on the Commission's actions.

Because we read footnote 5, in the context of the whole record, as meaning something quite different from what petitioner contends, we do not find the Commission's partial reliance on it objectionable.[20] The ALJ concluded that no remedial measures were necessary because Transco's new management had embarked on an ambitious program to increase supply levels that, according to testimony taken in 1975, would show positive results in the 1978–79 winter heating season.[21] NCUC attacked the decision not to order remedial measures by citing to Transco's increased curtailments in the 1976 and 1977 calendar years.[22] The later improvements of 1978 in Transco's supply situation cited by the Commission in note 5 rebutted the petitioner's exceptions and confirmed the ALJ's initial prognostications. The material contained in footnote 5 was therefore relevant to the Commission's decision to affirm the merits of the Initial Decision, rather than an indication that the dispute over the causes and preventive measures investigated was mooted[23] by the improvement in the supply situation.

20. Nor do we conclude, viewing the RP75–51 Order as a whole, that the Commission looked only at this post-1974 data when deciding whether to affirm the ALJ's decision. Though short, the Commission's discussion of the ALJ's findings and the exceptions taken therefrom was sufficiently detailed for us to conclude that the Commission considered all of the material in the record in arriving at its decision.

21. Initial Decision at 12; R. 6866; I J.A. 197; *see also* R. 56 (testimony of Mr. Bowen, Chief Executive Officer, Transco) (Jan. 27, 1975); I J.A. 3.

22. *See* Brief on Exceptions for State of North Carolina and NCUC, R. 6890; I J.A. 215.

23. We have an additional difficulty with petitioner's mootness argument. Because a section 14 investigation is merely a preliminary step towards possible further agency enforcement action, *see* Part V *infra*, no case or controversy will ordinarily exist until further agency action has been undertaken. While we can say that in the majority of cases no legal dispute exists at the investigation stage, the situation is better described as non-final than moot. To hold that an investigation is moot merely because it has no definite impact at the moment would necessarily lead to the vacation as moot of all investigative reports which are not linked to mandatory enforcement actions, at least until they are subsequently utilized in

## IV. STANDING

◼ Section 19(b) of the NGA, 15 U.S.C. § 717r(b), confers standing to seek review of Commission action on "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding . . . . " The requirement of aggrievement "serves to distinguish a person with a direct stake in the outcome of a litigation . . . from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 2417 n.14, 37 L.Ed.2d 254 (1973). To show aggrievement, a plaintiff must allege facts sufficient to prove the existence of a "concrete, perceptible harm of a real, non-speculative nature[.]" *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 716 (D.C.Cir.1977). FERC argues that NCUC has not been aggrieved by the Commission's order at issue in this case because it does not "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948). NCUC alleges two sources of aggrievement: first, it claims it has been aggrieved by FERC's and Transco's use of the Commission's order adopting the findings of the underlying investigatory report in related administrative and judicial proceedings; secondly, it claims it has been aggrieved by the Commission's decision not to recom-

mend remedial measures. We find both arguments unconvincing.

### A. *Petitioner's Aggrievement in Other Proceedings*

◼ Petitioner argues that it has been aggrieved by the utilization of the investigative order in three proceedings: (1) an appeal taken by Transco from a judgment obtained by CF Industries and Farmers Chemical Association, currently pending before the Fourth Circuit, (2) administrative compensation proceedings in FERC Docket No. RP72–99 ("RP72–99") and its associated investigation, FERC Docket No. TC79–6 ("TC79–6"), and (3) an administrative declaratory judgment order filed by Transco, FERC Docket No. TC79–8 ("TC79–8"). However, petitioner has failed to prove either that the order was used to its disadvantage in these proceedings, or if so used, it would be unable to attack the basis of any adverse finding in that proceeding. In the absence of such a showing, we find no aggrievement exists.

Petitioner's first claim of aggrievement arises from FERC's referral of the RP75–51 Order and investigative report to the Fourth Circuit for its use in the resolution of *CF Industries, Inc. v. Transco.*[24] However, NCUC's allegations fall far short of those necessary to establish aggrievement. NCUC has not demonstrated how the use of the order and/or report in the *CF Industries* court proceeding will adversely affect

---

enforcement proceedings. There is of course the possibility that a party may suffer so great an injury in certain circumstances from the public disclosure of the results of an investigation that he has standing to challenge the basis of the investigation.

**24.** The Fourth Circuit ordered this case held in abeyance pending referral of certain issues to the Commission. *See CF Industries, Inc. v. Transco*, 614 F.2d 33 (4th Cir. 1980). The plaintiffs in this case, the co-owners of a fertilizer plant in Tunis, North Carolina, whose deliveries of natural gas were curtailed during the 1974–75 winter heating season, sued Transco alleging four theories of liability:

    (1) the breach of Transco of its contract to deliver to [North Carolina Natural Gas Cor-

poration ("NCNG")] the retail distributor of natural gas in the Tunis area] certain quantities of natural gas on an uninterrupted basis to be used at plaintiffs' Tunis plant;

    (2) negligent performance of that contract by Transco resulting in foreseeable injury to the plaintiffs' operation;

    (3) fraud on the part of Transco incident to the negotiations between it and FCA during the period from 1965 to 1969 relative to the location and construction of the Tunis plant; and

    (4) violation by Transco of North Carolina's Monopolies, Trusts and Consumer Protection Act. N.C.G.S. § 75–1.1.

614 F.2d at 34.

its rights or obligations in any way.[25] It has alleged no facts which would indicate that the outcome of *CF Industries* will affect its rights directly or indirectly in other administrative or judicial proceedings. It is not this court's job to ferret out or even to speculate as to possible impacts of possible outcomes of existing lawsuits upon future litigation; it is the petitioner's responsibility to show the specifics of the aggrievement alleged, and this petitioner has not done so. *See Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975). Finally, even if NCUC might be affected in some way by the *CF Industries* litigation, intervention pursuant to F.R. Civ.P. 24[26] should provide NCUC with an adequate means of protecting its interests during the course of that proceeding. FERC has conceded both at oral argument and in post-argument submissions to this court that if investigative findings of the RP75–51 report and order are utilized in future administrative or judicial proceedings, the basis of those findings may be attacked in these new proceedings. Memorandum Responding to Question at Oral Argument at 5. Given the availability of alternate and more direct forums of judicial review, we see no reason to allow review here and now.[27] *See United States v. Los Angeles & Salt Lake Railroad Co.*, 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927) (ICC investigative report not reviewable until used as *prima facie* evidence in later proceedings).

25. NCUC's only claim of linkage to CF Industries is that "the facility at issue in the Farmers Chemical-Transco litigation . . . is located in North Carolina" and that "Farmers Chemical is among the North Carolina users of natural gas petitioner is charged with protecting, and that the question of adequate supplies at fair prices for Farmers Chemical, as well as the impact on the economy of North Carolina resulting from a shutdown, are matters of serious concern to *the State and the North Carolina Commission*." Petitioner's Post-Argument Memorandum at 2. These generalized allegations of common interest in the subject matter of the suit are not sufficient to prove NCUC's aggrievement by the introduction of the disputed report/order in that suit.

Moreover, it is not clear that the use of the report and order will hurt the plaintiffs in that suit, so that there may be no aggrievement to impute. The case is still pending. The potentiality of aggrievement is not as obvious as appears at first glance inasmuch as FERC transmitted with the documents a Report by the Federal Energy Commission on Referred Issues and Motion for Clarification of the Effect of the Court's Referral Order, *reprinted in* Memorandum Responding to Question at Oral Argument app. D, which explicitly sets out the limited relevance of its study to the case:
The Initial Decision of the Administrative Law Judge contains some information regarding the causes of Transco's shortage, especially with respect to the prudency of actions taken by Transco's producers. Because an *in-depth analysis was not deemed neces*sary, that decision does not focus directly on the sufficiency of Transco's efforts prior to the commencement of curtailment to ensure an adequate supply of gas to meet its contractual commitments.

*Id.* at 6. The Commission acknowledged its inability "to develop and interpret the historical record of this case," and requested the court to relieve it of the burden of determining the " 'facts and circumstances that resulted in the shortage of natural gas on Transcontinental Gas Pipe Line Corporation's interstate gas pipeline system that allegedly resulted the loss [sic] claimed by CF Industries, Inc. and Farmers Chemical Association, Inc.' " *Id.* at 7–11. The court acceded to this request in an order issued on February 17, 1981. Memorandum Responding to Question at Oral Argument at 5.

26. This rule provides in part:
(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action:
. . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action:
. . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

27. The courts would be flooded with cases if we allowed anyone who thought an agency action might have an impact on them sometime in the future to bring suit. *Cf. The National Conference of Catholic Bishops v. Smith*, 653 F.2d 535 (D.C.Cir.1981) (no case or controversy under Article III when plaintiffs alleged only a potential conflict with statutory demands).

Petitioner's second claim of aggrievement arises from the inclusion by reference of the record of the RP75–51 proceedings ("RP75–51 report") into the record of the TC79–6 proceedings ("TC79–6 report") utilized in the compensation proceeding denominated FERC Docket No. RP72–99.[28]  Here again petitioner has failed to show how any of the findings or non-findings of the report challenged in the instant proceedings could conceivably affect the outcome of the curtailment compensation proceedings to which it is a party.[29]  A speculative injury does not constitute aggrievement.  Cf. Lynchburg

**28.** This docket concerns the legality of a proposed settlement negotiated by Transco between the direct customers of Transco over issues arising out of the curtailments in delivery from November 16, 1974-November 15, 1975.  One of the provisions in the settlement agreement called for customers curtailed less than the system-wide average to compensate those curtailed more than the system-wide average.  By order of this court in *Consolidated Edison Co. v. FPC*, 511 F.2d 372 (D.C.Cir.1974), the compensation monies determined by the allocation provisions of the settlement agreement have been placed in an escrow account pending a decision on the legality of the agreement.

The FPC initially disapproved the settlement, and its decision was appealed to this court in *Transco v. FPC*, 562 F.2d 664 (D.C.Cir.1976), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978) ("Transco I").  The court there held that it could not determine the legality of the compensation scheme absent information regarding the duration, shape and causation of the alleged shortage on the Transco system" because

the legality of compensation may well turn, at least in part, on answers to the following sorts of questions . . . . will compensation be a short-term financial adjustment between customers of the pipeline to keep some of the customers financially afloat until the supply situation stabilizes, or will it be a permanent cross-subsidization?

562 F.2d at 669.  Upon remand, the proceeding was assigned to the same ALJ who had presided over the RP75–51 investigation at issue in this case.  He subsequently issued a report expressly incorporating his findings in RP75–51 "which are material" into TC79–6.  Report to the Commission, FERC Docket No. TC79–6 (Aug. 16, 1979) at 5, *reprinted in* Memorandum Responding to Question at Oral Argument app. D.

Contrary to petitioner's allegation that this report "largely duplicated his earlier report," Supplemental Brief for Petitioner at 5, the TC79–6 report, which was issued after additional hearings had been held and information and briefs submitted, covered different issues and included more detailed statistics on other issues than did the RP75–51 report.

Following submission of this report, the Commission, in a sudden reversal, *approved* the challenged settlement.  *See* Order on Compensation, FERC Docket Nos. RP72–99 & TC79–6 (Aug. 4, 1980), *reprinted in* Memorandum Responding to Question at Oral Argument app. D.  NCUC did not challenge the TC79–6 report because it assumed the Commission's reversal rendered harmless any error.  Supplemental Brief for Petitioner at 4 n.*.  The Commission then changed positions again, granting rehearing on the compensation issue and ordering the case remanded for further hearings.  *See* Order Granting Rehearing and Setting Compensation Issue for Hearing, FERC Docket Nos. RP72–99 & TC79–6 (Dec. 8, 1980), *reprinted in* Memorandum Responding to Question at Oral Argument app. A.  The December 8 order did not vacate the August 4 approval of the TC79–6 report.  Petitioner, alleging that the report therefore caused or could cause it harm in the renewed proceeding, filed for rehearing of the decision not to vacate, and upon its denial, for review of the challenged orders in this court.  *See* Supplemental Brief for Petitioner at 4–5.

Because the Commission has not rendered a final decision on the compensation issue, it is as yet impossible to know whether, or how, NCUC has been injured by the Commission's adoption of the TC79–6 report, let alone its indirect reliance upon the RP75–51 report.  Given the Commission's previous position on the compensation issue, there is at least a serious possibility that no injury will result.

**29.** NCUC contests here the allocation of blame for the creation of the curtailment situation, a question that appears of only marginal relevance to the question of fairness and nondiscrimination between *customers* (none of whom are to blame for the shortage) at issue in the curtailment proceedings.  Moreover, to the extent NCUC asks this court to overrule the ALJ's finding that Transco is remedying the causes of the curtailment on its own, NCUC appears to weaken its compensation argument, which rests on the premise that compensation is a "short-term financial adjustment [rather than] . . . a permanent cross-subsidization[.]" *Transco I, supra*, 562 F.2d at 669.  The court there noted that if the shortage was self-induced and likely to recur absent remedial measures by FERC, the compensation would more likely amount to a discriminatory, and therefore illegal, rate or charge than a temporary, and legal, surcharge or penalty payment. *Id.* at 668 n.5.

*Gas Co. v. FPC*, 336 F.2d 942, 946 (D.C.Cir. 1964) (present aggrievement exists if future aggrievement certain because of "intended influence of the order upon the business operations and management decisions of [petitioner]"). Moreover, NCUC has no answer to FERC's position, stated at oral argument and again in its Memorandum Responding to Question at Oral Argument at 5, that petitioner can attack any findings that give rise to aggrievement in the compensation proceeding itself to an ALJ or a review court more fully apprised of the relevance and significance of those findings to that proceeding than we are. We can think of no good reason to decide these questions now before it becomes clear whether NCUC will be hurt by the use of the RP75–51 findings in the curtailment proceedings.

Finally, NCUC claims it was aggrieved by FERC's reliance on the RP75–51 order in the declaratory judgment action filed by Transco as FERC Docket No. TC79–8. In the first place, FERC rendered its decision in this declaratory judgment action two months *before* it affirmed the ALJ's opinion in RP75–51;[30] the Commission never explicitly relied on the RP75–51 investigative report let alone the challenged order in the TC79–8 proceeding.[31] Moreover, in its decision in TC79–8, FERC expressly excluded from consideration and decision the is-

sues on which the RP75–51 Order or investigation might have had a marginal impact.[32] Finally, NCUC has been granted leave to intervene in TC79–8, and consistent with FERC's announced policy, should be allowed to contest there any disputed findings of RP75–51 relevant to that proceeding.

In sum, NCUC has failed to show that it has been aggrieved or will be aggrieved by Commission or court reliance on the disputed order in related proceedings; moreover, this court accepts the Commission's assurances that NCUC can dispute any findings contained in the RP75–51 Order when and if they are utilized to NCUC's disadvantage in other Commission or court proceedings. Under these circumstances, we must hold that no aggrievement exists within the meaning of section 19(a) of the NGA.

### B. *Investigative Termination as Aggrievement*

■ Petitioner's second theory of aggrievement relies on the failure of the RP75–51 Order to recommend remedial measures. It contends that this is the sort of "negative order" which gave rise to sufficient aggrievement to confer reviewability in *City of Chicago v. United States*, 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969). However, a "negative order" which "main-

**30.** *See* Order Granting in Part and Denying in Part Petition for the Institution of Proceedings and for a Declaratory Order, Establishing Procedures for Briefing and for Hearing and Granting Interventions ("TC79–8 Order"), FERC Docket No. TC79–8 (Aug. 17, 1979), *reprinted in* Memorandum Responding to Question at Oral Argument app. C.

**31.** FERC noted the institution of the RP75–51 proceeding in two footnotes, *id.* at 3 n.2, 6 n.10, and mentioned in text that "[t]he final resolution . . . is still pending." *Id.* at 3. These are the only explicit references to the RP75–51 proceeding in the TC79–8 Order.

**32.** FERC expressly refused to rule on or "to institute a proceeding to inquire into the facts and circumstances that resulted in the shortage of gas on Transco's pipeline system" due to "the potential for a substantial burden on the Commission's limited resources," *id.* at 5–6; to "adjudicate specific common law claims of contract liability . . . . [or to make] a determi-

nation as to negligence or wrongful conduct," *id.* at 7; to "issue a declaratory order as to . . . requests which concern the causation of the shortage of gas on Transco's system and the reasonableness and prudence of Transco's actions," *id.* at 11–12; or a "declaratory order . . . with respect to the issue of whether Transco's compliance with curtailment tariff provisions is a complete defense to breach of contract damage claims," *id.* at 13. The only issues left before or decided by the Commission in that proceeding are the narrow ones of "[t]he interpretation and effect of Transco's gas tariff curtailment provisions and the Commission's approval thereof," *id.* at 8; "whether an undue preference or advantage has been or would be granted to any person" by the award of damages in the context of curtailment damage suits, *id.* at 10; and "Transco's technical compliance with Commission rules and regulations," *id.* at 12.

tain[s] the status quo" gives rise to aggrievement only in situations where a party has a right to a departure from the status quo, as the petitioner in *City of Chicago* did. In this case, no matter what the results of the investigation, FERC had no statutory duty to enact remedial measures. Therefore, the report's recommendation not to institute specific remedial measures was not of sufficient import to constitute a legally cognizable aggrievement.

In *City of Chicago*, the Court held reviewable an order of the Interstate Commerce Commission ("ICC") discontinuing an investigation into the termination of service by several passenger rail trains. In so doing, it cited the following passage from *Rochester Telephone Corp. v. United States*, 307 U.S. 125, 142–43, 59 S.Ct. 754, 763, 83 L.Ed. 1147 (1939):

> An order of the Commission dismissing a complaint on the merits and maintaining the *status quo* is an exercise of administrative function, no more and no less, than an order directing some change in status. The nature of the issues foreclosed by the Commission's action and the nature of the issues left open, so far as the reviewing power of courts is concerned, are the same.

396 U.S. at 166–67, 90 S.Ct. at 311–12. While the literal words of *City of Chicago* would seem to offer petitioner succor, a closer look at what was really going on in that case discloses that it dealt with an entirely different situation, necessitating an entirely different result.

At issue in *City of Chicago* was the reviewability of an order terminating an investigation under section 13a(1) of the Interstate Commerce Act ("ICA"). Under this section, the ICC had the option of investigating the discontinuance or change of passenger rail service for conformity with the statute's public convenience and necessity standard within 30 days of notification of said discontinuance or change. Though the decision to launch an investigation was undeniably unreviewable, 396 U.S. at 165, 90 S.Ct. at 311, section 14(1) of the ICA mandated that:

> whenever an investigation shall be made by said Commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the Commission, together with its decision, order or requirement in the premises . . . .

The Supreme Court interpreted section 14(1) to give affected parties a right to a reasoned decision on the merits of any investigation undertaken.[33]

**33.** Petitioners' reliance on *Minneapolis Gas Co. v. FPC*, 294 F.2d 212 (D.C.Cir.1961), for the proposition that the termination of an investigation gives rise to a legally cognizable injury is also misplaced. The investigation at issue in *Minneapolis Gas* was instituted pursuant to section 4 of the NGA, 15 U.S.C. § 717c(e), which empowers the Commission to "enter upon a hearing concerning the lawfulness of such rate[.]" Section 5 of the NGA, 15 U.S.C. § 717d(a), provides in pertinent part:

> Whenever the Commission, after a hearing upon its own motion or upon complaint . . . , shall find that any rate . . . is unjust [or] unreasonable, . . . the Commission shall determine the just and reasonable rate . . . *and shall fix the same by order* . . . .

(emphasis supplied). The court held that the Commission could not terminate proceedings instituted pursuant to section 4(a) after the ALJ had made findings of fact, reached conclusions, and rendered an initial decision, and exceptions to that decision had been argued to the Commission. (It specifically left open, however, the possibility that the agency had the discretion to terminate the proceedings at an earlier point. *Minneapolis Gas Co. v. FPC, supra,* 294 F.2d at 214.) Because the Commission was required to take specific enforcement action based on the outcome of this investigation, its decision to affirm or reject the ALJ's decision was reviewable. The court in *Minneapolis Gas* recognized that to allow the Commission to terminate its proceedings at so late a stage would have provided the agency with an easy method to escape review in cases where it found, after investigation, that rates were reasonable.

> It seems to us that the statute requires the Commission to make an early choice between its discretion and the binding necessities of a decisional process. It cannot, we think, pursue one course almost to the end and then protect its last step by reverting to its discretionary power.

294 F.2d at 215. The same invitation to evasion of review does not exist here as findings in section 14 investigations impose no duties upon the Commission to act and are therefore generally unreviewable. *See* Part V *infra*.

■ By contrast here, Congress did not create a right to a decision in a section 14 investigation nor did it directly link findings reached in section 14 investigations to enforcement actions. Section 14 investigative results can only be utilized in subsequent proceedings, where they can be attacked by parties [34] to the proceeding.[35] The applicable regulation stresses the flexibility of action left FERC after the conclusion of the investigation:

> Where it appears that there has been or may be a violation of any of the provisions of the acts administered by the Commission or the rules, opinions or orders thereunder, the Commission *may* institute administrative proceedings, initiate injunctive proceedings in the courts, refer matters, where appropriate, to the other governmental authorities, *or take other appropriate action.*

18 C.F.R. § 1b.7 (emphasis supplied). Precisely because any impact of a section 14 investigation is contingent on future administrative action, the Court in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 618–19, 64 S.Ct. 281, 295, 88 L.Ed. 333 (1944), held "certain findings as to the lawfulness of past rates which Hope had charged its interstate customers" made in the context of a section 14 investigation were not reviewable by the courts, but rather "a preliminary, interim step towards possible future action." *Id.* at 618–19, 64 S.Ct. at 295. *See also United States v. Los Angeles & Salt Lake Railroad Co.*, 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927) (holding valuation of property after investigation pursuant to § 19a of the Valuation Act not reviewable because no aggrievement caused; fact that the valuation constitutes *prima facie* evidence in subsequent actions does not "prevent the report from being solely an exercise of the function of investigation").

These cases clearly demonstrate that the Court does not normally consider purely investigatory findings, not directly linked to agency enforcement proceedings,[36] of sufficiently definite impact to give rise to the aggrievement necessary for standing under section 19(a) of the NGA.

■ Moreover, petitioner lacks standing because its claimed injury cannot be redressed by an order of this court reversing, remanding, or vacating the Commission's RP75–51 Order. The vitality of the requirement of redressability has been repeatedly reaffirmed by both the Supreme Court and this court. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Duke Power Company v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Physicians' Education Network, Inc. v. Department of Health, Education and Welfare*, 653 F.2d 621 (D.C.Cir.1981). Petitioner claims as its sole injury stemming from the termination of the investigation FERC's refusal to adopt "remedies designed both to alleviate the existing shortage and to prevent recurrence of a similar crisis in the event of another shortage." Reply Brief for Petitioner at 6. However, as detailed in Part V of this opinion, FERC is not required to adopt remedial measures even if it affirms an investigative report recommending them. The final decision as to what if any action should be taken with respect to an investigative report rests within the agency's discretion. We cannot find that it is substantially likely that the agency will implement remedial measures simply because we declare the RP75–51 Order moot, incorrect or incomplete. "Only speculative in-

---

**34.** There are no "parties" to investigations conducted under section 14. 18 C.F.R. § 1b.11.

**35.** *See* text at note 27 *supra* (FERC's position on reviewability of findings in future proceedings). *See generally South Dakota Public Utilities Commission v. FERC*, 643 F.2d 504 (8th Cir. 1981) (court reviewed methods by which investigation into amount of natural gas re-

serves was conducted during FERC depreciation rate proceeding).

**36.** If the possibility of future enforcement proceedings is considered too speculative to be considered "aggrievement," it necessarily follows that the loss of that possibility, the injury decried in this case, must also be termed too speculative.

ferences could lead us to such a conclusion because the record does not carry us that far, and 'unadorned speculation will not suffice to invoke the judicial power.'" *Physicians' Education Network, Inc. v. Department of Health, Education and Welfare,* Civ. No. 79–2701 (D.D.C. May 12, 1980), *aff'd,* 653 F.2d 621 (D.C.Cir.1979) (*citing Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 44, 96 S.Ct. at 1927).

## V. REVIEWABILITY

As petitioner noted in its reply brief, *see* Reply Brief for Petitioner at 5, respondent's reviewability argument is closely tied to its aggrievement argument. The fact that petitioner has not yet been aggrieved by the Commission's order affirming the Initial Decision is an indication that it is the sort of "nonfinal administrative order [ ]" for which "[j]udicial intervention would be cumbersome and inappropriate." *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 237, 239 (D.C.Cir.1980), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980). Moreover, as explained above, if a later proceeding does result in actual aggrievement, the opportunity to contest the order or findings will also arise. Therefore, resolution of the issues at this early investigative stage is not necessary to prevent unfairness at the later enforcement stage, and if allowed might lead to the consideration of many issues which need never be considered at all. For such reasons, courts traditionally refuse to rule on interim agency orders. *See The National Conference of Catholic Bishops v. Smith, supra,* 653 F.2d at 541–542. We see no reason to depart from this practice here.

■ Review of investigative findings unaccompanied by remedial measures would be similarly wasteful. On the one hand, investigative findings can be overruled or rendered impotent by future agency actions, and on the other, correcting improper investigative findings does not necessarily affect future agency decisions. The applicable statutes commit the decisions to prosecute [37] and to institute new regulations [38] to agency discretion; while the agency may, and we assume it does, rely on investigative reports when exercising that discretion, it is under no obligation to follow their recommendations.[39] Therefore, courts should not ordinarily review orders relating only to the investigative function.

■ Finally, and perhaps most importantly, to the extent our review of investigative decisions did influence agency actions, we would be intruding into areas committed to agency discretion. As the Court made clear in *Arrow Transportation Co. v. Southern Railway Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963) and *Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), courts should not prejudge issues arising in preliminary agency actions which are relevant to a final agency decision committed either to agency discretion or its primary jurisdiction. Thus this court has held that we cannot review

---

**37.** (a) Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, *it may in its discretion bring an action* in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. *The Commission may transmit such evidence as* may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings. 15 U.S.C. § 717s (emphasis supplied).

**38.** The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations *as it may find necessary or appropriate to carry out the provisions of this chapter.* 15 U.S.C. § 717o (emphasis supplied).

**39.** *See* 18 C.F.R. § 1b.7.

FERC's decisions to accept rate filings, *see Papago Tribal Utility Authority v. FERC, supra,* or those of the FCC to accept tariff filings, *see Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221 (D.C.Cir.1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981), because to do so would involve judicial examination of issues, such as the reasonableness of the rates at issue, before the agency which had primary jurisdiction over the question expressed its final opinion. Judicial review at the initial stage, because of its possible effect on final agency decisionmaking, would "undermine the authority of the agency acting within the scope of its discretion." *Papago Tribal Authority v. FERC, supra,* at 243. Just as the decision to accept or reject a rate filing is a "necessary adjunct to the unreviewable decision to suspend and investigate," *id.,* the decision to accept or reject an investigatory report here is a necessary adjunct to the agency's unreviewable decision to recommend or decline enforcement or rulemaking proceedings. The same substantive questions are relevant to review of the one as to the other. For this reason, judicial review of the initial investigative findings in contexts other than enforcement or rulemaking proceedings would run the risk of "invad[ing] the province reserved to the discretion of the agency." *Id.,* at 243.

### CONCLUSION

In sum we do not agree with petitioner that the Commission's order should be dismissed as moot; we find no aggrievement at this time enabling petitioner to challenge the substantive basis of the Commission's decision to terminate the investigation and to decline to undertake remedial measures; and we do not think its order reviewable.

*Appeal dismissed.*