**PHYSICIANS' EDUCATION NETWORK, INC., For and on behalf of its members, Appellant,**

v.

**The DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, et al.**

No. 80–1759.

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1981.

Decided April 27, 1981.

Jamie L. Whithen with whom Martin G. Hamberger was on the brief for appellant.

Valerie K. Schurman, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief for appellees.

Before MacKINNON, MIKVA and EDWARDS, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM.

Physicians' Education Network (Physicians') represents the interests of opthalmologists. It appeals from a district court ruling that it lacks standing to seek the rescission of a report from the Secretary of the Department of Health, Education and

Welfare (HEW) recommending that Medicare reimbursement for eye care limited to services performed by opthalmologists be extended to certain services performed by optometrists. The report was prepared to comply with section 109 of Pub.L. No. 94–182.[1] In accordance with remarks made by the author of the bill on the Senate floor, a panel of consultants was convened to assist the Secretary with the preparation of the report.

Physicians' principal complaint is that the composition of the panel was rigged so as to reflect only the optometrists' viewpoint, and that the panel operated in violation of a number of the provisions of the Federal Advisory Committee Act, Pub.L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, Title 5 United States Code, Appendix I.[2] One difficulty with relying on this Act is that Pub.L. No. 94–182 did not authorize the establishment of an advisory committee. Only if it had done so would the Advisory Committee Act mandate that the legislation "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented" and "contain appropriate provisions" to guard against "inappropriate[ ] influence[ ] by . . . any special interest." 5 U.S.C.App. § 5 (b)(2), (3). It is thus apparent that not all of the safeguards of the Advisory Committee Act were operative, even assuming that restrictions placed on *legislation* could be invoked against the Secretary.

In any event, Physicians' did not act timely to monitor the progress of the report

1. SEC. 109. The Secretary of Health, Education and Welfare shall conduct a study of, and submit to Congress not later than 4 months after the date of enactment of this section a report containing his findings and recommendations with respect to, the appropriateness of reimbursement under the insurance program established by part B of title XVIII of the Social Security Act for services performed by doctors of optometry but not presently recognized for purposes of reimbursement with respect to the provision of prosthetic lenses for patients with aphakia. 89 Stat. 1053–54 (1975).

2. The complaint alleged that the action by the committee and the Secretary was

arbitrary, capricious, without rational basis, an abuse of discretion, a violation of the requirements of due process and equal protection of the law as encompassed in the Fifth Amendment to the Constitution of the United States, a violation of the requirements of Public Law 94–182 for an objective inquiry and report, a violation of the requirement of the Federal Advisory Committee Act, a violation of the requirement of 42 USC Sec. 209(f) and Chapter 304 of the Federal Personnel Manual, constitutes Federal interference with the practice of medicine in violation of 42 USC Sec. 1395 and violates the duty owed by *defendants* under Title 42 USC to protect the health and welfare of medicare recipients. [App. 10.]

following the enactment of Pub.L. No. 94–182 in December 1975, despite the fact that the report was subject to a four month deadline. Physicians' does not allege that it sought and was denied participation in the panel's meetings, or that it sought and was denied representation on the panel itself. Allegations of this kind have been found sufficient in other cases to support standing to invoke the provisions of the Federal Advisory Committee Act against an agency.[3] Far from acting promptly, Physicians' did not sue until October 1979, more than three years after the report was delivered to Congress in July 1976.

To establish standing to complain in the district court, Physicians' was thus left to argue that ophthalmologists would suffer economic injury as a result of the illegal procedures alleged. The theory of the complaint was that the report was the product of these procedures, that the report would cause passage of an act entitling optometrists to more Medicare reimbursement, and that these optometrists would then divert Medicare-subsidized business from ophthalmologists. In addition to "injury in fact," Physicians' was also required to show that the relief requested (rescission of the report) would redress the injury complained of (loss of customers), i. e., that rescission of the report would break the alleged chain of causation by inducing the Secretary and, in turn, Congress to reject any proposed extension of Medicare subsidy for services performed by optometrists.

On defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6), the district court (Pratt, J.) concluded that Physicians' lacked standing. Although finding "considerable force" in defendant's argument that Physicians' had shown no likely injury in fact, the court rested its holding on the ruling that there was no substantial likelihood that granting the relief requested would redress the injury complained of.

We agree with the district court and adopt its analysis, set forth as an appendix to this opinion. Moreover, since the filing of this appeal, Congress on December 5, 1980 enacted the legislation contemplated by Pub.L. No. 94–182.[4] This development only strengthens the district court's conclusion that there is no substantial likelihood that rescission of the report will redress the injury of Physicians' members. To establish standing Physicians' must now prove that rescission will not merely stay the hand of Congress but move it into action (by repealing the legislation just passed). Physicians' conjecture is thus presently even more tenuous than the claim Judge Pratt aptly characterized as "nothing more than speculation." *Cf. Metcalf v. Petrole-*

---

3. *E. g., Center for Auto Safety v. Tiemann*, 414 F.Supp. 215, 220 (D.D.C.1976) (plaintiffs had standing to invoke Advisory Committee Act against agency failing to open committee meetings to public and denying plaintiffs' request for transcripts of meetings), *remanded on other grounds*, 580 F.2d 689 (D.C.Cir.1978); *Nader v. Baroody*, 396 F.Supp. 1231–1232 (D.D.C.1975) (plaintiff denied admission to committee meeting has standing to seek order that defendant comply with open meeting and other requirements of Advisory Committee Act). See also *Consumers Union v. HEW*, 409 F.Supp. 473, 475 (D.D.C.1976) (plaintiff denied permission to attend or participate in committee meeting has standing to invoke Advisory Committee Act) (by implication), *aff'd mem.*, 551 F.2d 466 (D.C. Cir.1977); *Lombardo v. Handler*, 397 F.Supp. 792 (D.D.C.1975) (plaintiff unsuccessful in attempts to gain access to closed-door committee deliberations has standing to invoke Advisory Committee Act) (by implication), *aff'd mem.*, 546 F.2d 1043 (D.C.Cir.1976), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977).

4.

### OPTOMETRISTS' SERVICES

SEC. 937. (a) Clause (4) of the first sentence of section 1861(r) of the Social Security Act is amended by striking out "but only with respect to establishing the necessity for prosthetic lenses," and inserting in lieu thereof "but only with respect to services related to the condition of aphakia."

(b) The Secretary of Health and Human Services shall submit to the Congress by January 1, 1982, legislative recommendations with respect to reimbursement under title XVIII of the Social Security Act for services furnished by optometrists in connection with cataracts and such other services which they are legally authorized to perform.

(c) The amendment made by subsection (a) shall apply to services furnished on or after July 1, 1981.

Pub.L. No. 96–499, § 937, amending 42 U.S.C. § 1395x(r).

*um Council*, 553 F.2d 176, 183–87 (D.C.Cir. 1977) (petroleum consumers lack standing to challenge petroleum industry domination of advisory committee to Department of Interior); *see also Mulquenny v. National Commission*, 549 F.2d 1115, 1121 (7th Cir. 1977) (opponents of Equal Rights Amendment lacked standing to challenge political composition of women's rights commission because, even assuming injury in fact, it was "wholly conjectural" whether changing composition and conduct of committee would result in continuing rejection of the amendment by the Illinois legislature).

 We are thus faced with the fact that the Secretary has made his report, the Congress has enacted its law, and Physicians would have us speculate on what Congress will do in the future on the basis of a series of tenuous inferences. Appellant has let the time slip by when our decree could have any significant effect. For this court to act now in such circumstances is beyond its authority since "federal courts are without power to decide questions that cannot affect the rights of the litigants before them. *Oil Workers Unions v. Missouri*, 361 U.S. 363, 367, 80 S.Ct. 391, 394, 4 L.Ed.2d 373 (1960)." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). Physicians' must address its complaint to Congress.

*Affirmed.*

## APPENDIX

MEMORANDUM OPINION of JOHN H. PRATT, District Judge.

Plaintiff Physicians Education Network, Inc. is suing the Department of Health, Education and Welfare and its Secretary, Patricia Harris, for declaratory and injunctive relief. Plaintiff seeks to have this court declare unlawful and order rescinded a report prepared by defendant HEW and transmitted to Congress. For the reasons discussed below, we find that plaintiff lacks standing to maintain this action, and we accordingly grant defendant's motion to dismiss.

## FACTS

Plaintiff Physicians Education Network, Inc., is an organization of over 1300 opthalmologists practicing throughout the country. Opthalmologists are physicians who specialize in opthalmology, a branch of medical science dealing with the structure, functions, and diseases of the eye. Plaintiff's concern centers on a report [1] prepared by defendant HEW in 1976 pursuant to a Congressional directive [2] to recommend the appropriateness of reimbursement under the medicare program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, for certain services performed by doctors of optometry which are not now reimbursable under the Act. A doctor of optometry is not a physician but rather is a health professional who performs eye examinations to determine the presence of visual, muscular, or neurological abnormalities, and prescribes lenses, other optical aids, or therapy. According to the Institute of Medicine of the National Academy of Sciences, optometrists are trained to recognize disease conditions of the eye and ocular manifestations of other diseases, and to refer patients with these conditions to the appropriate health professional, *i. e.*, an ophthalmologist or other physician. The report at issue here recommends that the range of services for which optometrists may be reimbursed under medicare be expanded to include services now only reimbursable if performed by a physician.

More specifically, under Part B of Title XVIII, which is a voluntary supplemental benefits plan available to any person aged 65 or older,[3] regardless of social security

---

1. United States Department of Health, Education and Welfare Report to the Congress: Reimbursement Under Part B of Medicare for Certain Services (1976) (hereinafter "1976 Report").

2. Act of December 31, 1975, Pub.L. No. 94–182, § 109, 89 Stat. 1053.

3. Also eligible under Plan B are certain persons under age 65 who are disabled or suffer from chronic renal disease.

status, the only services provided to cataract patients for which optometrists may be reimbursed are dispensing services in connection with the actual fitting and provision of prosthetic lenses.[4] The 1976 HEW Report recommends that insurance coverage under Part B include optometric services rendered by optometrists to patients after they have undergone surgery for cataracts. Presently, these services are reimbursable under medicare only if provided by an ophthalmologist or other qualified physician.

Plaintiff disputes the soundness of this recommendation[5] and levels a barrage of criticism at the 1976 report. Plaintiff alleges that defendant deliberately distorted the subject of the study and the report itself, largely because of "undue influence" by lobbyists for the National Association of Optometrists. Plaintiff alleges that defendant purposely selected as consultants for the study a majority of individuals who had a vested interest in the outcome reached and a predisposition to reach that outcome, that the "advisory" committee was selected in violation of the Federal Advisory Committee Act, 5 U.S.C. Appendix I, and the Federal Personnel Manual. Plaintiff further alleges that defendant suppressed from publication in the report findings of the National Institute of Health and the National Eye Institute critical of the report and its conclusion, and wrote the report in such a way as to convey the impression that the findings of these institutions were favorable to the conclusion reached. In addition to allegedly violating the Federal Advisory Committee Act and the Federal Personnel Manual, plaintiff alleges that defendant's conduct violated 42 U.S.C. § 209(f) and § 1395, Pub.L. No. 94–182, *supra*, and the due process and equal protection guarantees of the United States Constitution.

Plaintiff alleges that two pieces of legislation which include provisions expanding medicare coverage as recommended by the 1976 report are pending before the House and Senate, after having been reported favorably by committees of each house of Congress,[6] and that "congressional staff indicate that this report occupies a central place in the justification for the coverage extension."[7]

By their amended complaint, plaintiff alleges that individual members of its organization will be harmed economically by passage of this legislation because it will cause opthalmologists who practice in proximity to optometrists to lose medicare patients to optometrists. Plaintiff's reasoning is that some cataract patients will utilize the services of optometrists rather than ophthalmologists after surgery if those services are covered by medicare benefits.

Plaintiff asks this court to declare that the 1976 report prepared by defendant HEW is in violation of civil service regulations and of various statutory and constitutional provisions. Plaintiff has also moved for a preliminary injunction requiring defendants to rescind the 1976 report.

Defendants have opposed the motion for a preliminary injunction and have filed a motion to dismiss the complaint pursuant to

---

**4.** A cataract is any opacity of the crystalline lens of the eye. Because the condition usually results from the normal physiological aging process, a large number of the elderly suffer from some degree of cataract. At present the only effective treatment for cataract is the surgical removal of the diseased natural lens and its replacement with a prosthetic lens.

**5.** In support of its criticism of the 1976 report's conclusion, plaintiff points to a 1968 congressionally-mandated study prepared by another unit within defendant HEW, which reached the opposite conclusion (*i. e.*, that then-existing coverage for optometric services should not be extended).

**6.** According to plaintiff's amended complaint, H.R. 934 has been reported favorably by the United States Senate Committee on Finance and H.R. 3990 has been reported by the United States House of Representatives Committee on Ways and Means.

**7.** This statement is contained in a copy of a Department of Health, Education and Welfare memorandum written by Dr. Mark Chassin, dated August 17, 1979, and filed as Ex. 17 to plaintiff's amended complaint.

Rule 12(b)(6), Fed.R.Civ.P., because plaintiff lacks standing and because this suit is barred by the doctrine of laches. For the reasons discussed below, we dismiss this action because plaintiff lacks standing to maintain this lawsuit. We therefore do not consider plaintiff's motion for a preliminary injunction.

## ANALYSIS

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldon,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A litigant's standing is constitutionally limited by the Article III provision restricting the judicial power to the hearing of cases or controversies. This constitutional restriction is reflected in the requirements that the plaintiff suffer some actual or threatened injury as a result of the putatively illegal conduct of the defendant, *and,* assuming there is actual or threatened injury, that there be a substantial likelihood that the injury will be redressed if the requested relief is granted.[8] *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Duke Power Company v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

In considering a motion to dismiss for lack of standing to determine whether these two requirements have been met, we must accept as true all material allegations of the complaint, and we must construe the complaint in favor of the complaining party. *Warth v. Seldon, supra.* Normally, mere allegations will suffice, but if controverted by the defendant, the plaintiff must demonstrate facts supporting his allegations. *Public Citizen v. Lockheed Aircraft Corpo-*

*ration,* 565 F.2d 708, 714 n. 22 (D.C.Cir. 1977); *Sierra Club v. Morton,* 514 F.2d 856, 870 n. 20 (D.C.Cir.1975), *rev'd on other grounds sub nom. Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Also, "... it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact, deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth v. Seldon, supra,* 422 U.S. at 501–2, 95 S.Ct. at 2206–07.

By its amended complaint, plaintiff has submitted affidavits from several of its members alleging that they will suffer economic injury as a result of the enactment of legislation expanding medicare coverage for certain services provided by optometrists. Plaintiff alleges that if medicare benefits are expanded to allow reimbursement for certain optometric services performed by optometrists after cataract surgery, which are now only reimbursable under medicare if performed by ophthalmologists or other physicians, ophthalmologists practicing in proximity to optometrists will lose some medicare patients to optometrists.

Although economic injury alone may be sufficient to meet the injury in fact requirement of Article III, we need not consider whether plaintiff has established a sufficiently tangible and cognizable injury[9] because we conclude that plaintiff has failed to satisfy the second necessary requirement for standing—that there be a substantial likelihood that the injury complained of will be redressed if the requested relief is granted. The vitality of this redressability requirement was recently reaffirmed by this Circuit's Court of Appeals. *See Greater Tampa Chamber of Commerce,*

---

**8.** The requirement of redressability includes the concept that there must be a causal connection between plaintiff's claimed injury and defendant's action.

**9.** Defendants argue, with considerable force, that plaintiff's injury or threat of injury is so

speculative and unpredictable as to fall short of being "injury in fact." Defendant's Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction and in Support of Defendant's Motion to Dismiss, pp. 5–8.

*et al. v. Goldschmidt, et al.*, 627 F.2d 258 (D.C.Cir.1980).

According to plaintiff's allegations, the injury complained of here will occur. *only* upon passage by Congress and signing into law by the President of legislation extending the medicare coverage as recommended in the 1976 report prepared by defendant HEW. To conclude that plaintiff has standing to maintain this action, it is therefore necessary for us to find that it is substantially likely that Congress will not pass the expansion of medicare coverage *if we declare the 1976 report in violation of certain regulations, statutory provisions, and/or constitutional requirements and accordingly order it rescinded.* Only speculative inferences could lead us to such a conclusion because the record does not carry us that far, and "unadorned speculation will not suffice to invoke the judicial power." *Simon, supra* 426 U.S. at 44, 96 S.Ct. at 1927.

We acknowledge that by being reported favorably by the relevant committees of each house, this legislation has cleared one of the major obstacles on its way toward enactment. We also accept as true the allegation contained in an exhibit submitted with plaintiff's amended complaint that "congressional staff indicate that this report occupies a central place in the justification for the coverage extension." But even construing these and the other allegations in the complaint in favor of the plaintiff, as we must, we cannot conclude that plaintiff has established a substantial likelihood that the injury complained of will be redressed if the requested relief is granted.

There is nothing more than speculation to support the conclusion that a judicially-ordered rescission of the report is substantially likely to prevent enactment of the legislation expanding medicare coverage. Other results are equally as plausible. Although the Congress certainly considers executive branch reports while deliberating on legislation, the Congress is a political body, and it responds to political influences as well. This in itself makes it extraordinarily difficult to demonstrate that any action by this court could or would provide relief for the injury claimed. For example, given the allegation in the complaint of the "undue influence" exerted, allegedly successfully, by lobbyists for the National Optometric Association, and assuming *arguendo* that rescission of the report would adversely affect chances of the legislation's passage, it seems as likely as not that any such impact could be offset by further lobbying activities directed at the Congress. It also seems likely that the Congress could consider the merits of any judicially-ordered rescission, disagree with it and, in its discretion, decide that the expansion of medicare coverage was nevertheless warranted.

The existence of these equally as plausible alternatives indicates that plaintiff has failed to demonstrate that the relief requested is substantially likely to redress the harm alleged. "[A] federal court [may] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon, supra* at 41–2, 98 S.Ct. at 1925–26. The injury complained of, if it ever occurs, will result from action by the Congress, which is an independent third party and not before this court.

Because plaintiff has failed to meet one of the two constitutional prerequisites of standing to maintain this action, we dismiss the complaint without considering plaintiff's motion for a preliminary injunction.

An order consistent with the foregoing has been entered this day.