**COMMON CAUSE, et al., Appellants,**

**v.**

**DEPARTMENT OF ENERGY, et al.**

**No. 80–2395.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 22, 1981.

Decided March 4, 1983.

---

purposes, CCOs that the Agency "relied upon." Because we hold that all CCO index digests Schlefer describes in his request must be disclosed, we express no opinion on the practicability of a "relied upon" formula for FOIA disclosure.

Ellen G. Block, Washington, D.C., with whom Kenneth J. Guido, Jr., and Donald Simon, Washington, D.C., were on the brief, for appellants.

Marilyn S.G. Urwitz, Atty., Dept. of Justice, Washington, D.C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before ROBINSON, Chief Judge, BAZELON and ROBB, Senior Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Appellants seek injunctive and declaratory relief directing the Department of Energy (DOE) and the Office of Management and Budget (OMB) to develop an energy conservation plan for buildings owned and leased by the federal government.[1] Such a plan is required by 42 U.S.C. § 6361(a)(2) (1976), enacted as part of the Energy Policy and Conservation Act of 1975 (EPCA).[2] The district court dismissed for want of standing.[3] We agree that appellants do not have standing to pursue this action, though for different reasons than those relied upon by the court below.

## I. Background

### A. The Conservation Plan

Congress enacted EPCA in the wake of the Arab oil embargo of 1973–74. The Act is an omnibus measure that includes a myriad of provisions pertaining to the production, stockpiling, conservation, and pricing of energy resources.[4] One of EPCA's provisions, added by House and Senate conferees and codified at section 6361(a)(2), provides:

> The President shall develop and, to the extent of his authority under other law, implement a 10-year plan for energy conservation with respect to buildings owned

---

1. Appellants are Common Cause, a non-profit membership corporation organized under the laws of the District of Columbia, and its president. They brought this action on behalf of Common Cause's 220,000 dues-paying members. In addition to DOE and OMB, appellants sue the Secretary of DOE and the Director of OMB, both in their official capacities.

2. EPCA § 381(a)(2), Pub.L. No. 94–163, 89 Stat. 939 (codified at 42 U.S.C. § 6361(a)(2) (1976)).

3. Common Cause v. Department of Energy, Civ. No. 80–0856 (D.D.C. Sep. 17, 1980) [hereinafter cited without cross-reference as "District Court Opinion"], reprinted in Joint Appendix ("JA") at 17–23.

4. See, e.g., 42 U.S.C. §§ 6211–6214 (1976) (development of energy resources); id. §§ 6231–6246 (creation of strategic petroleum reserve); id. §§ 6261–6275 (standby presidential rationing authority); id. §§ 6291–6326, 6341–6363 (fuel economy standards for automobiles, efficiency standards for major appliances and for industry generally, and energy conservation programs for federal and state governments); 15 U.S.C. § 757 (1976) (crude oil pricing formula revised by EPCA).

or leased by an agency of the United States. Such plan shall include mandatory lighting efficiency standards, mandatory thermal efficiency standards and insulation requirements, restrictions on hours of operation, thermostat controls, and other conditions of operation, and plans for replacing and retrofitting to meet such standards.[5]

By executive order, responsibility for developing the ten-year plan was delegated in 1976 to the Federal Energy Administration (FEA);[6] FEA's duties were in turn transferred to DOE in 1977.[7]

Pursuant to section 6361(a)(2), President Carter in 1977 established goals for (1) reducing energy consumption by twenty percent in federally owned existing buildings by 1985; (2) reducing consumption by forty-five percent in federally owned new buildings by 1985; and (3) restricting new federal leasing to buildings that will likely meet or surpass the forty-five percent standard.[8] To achieve these goals, the President (1) ordered every federal agency to conduct "energy audits" of buildings under its jurisdiction and to implement systematic life-cycle costing procedures; (2) directed every agency to design an individual ten-year plan to meet the percentage-reduction goals; and (3) instructed DOE to develop, with the concurrence of OMB, guidelines for the individual agency plans.[9]

In November 1979, DOE issued regulations for the formulation of individual agency plans and for the review of such plans by the Department.[10] Included in these regulations are mandatory standards governing improvements in lighting efficiency,[11] thermal efficiency,[12] insulation,[13] restriction of hours,[14] thermostat controls,[15]

5. The legislative history contains no discussion of this provision beyond a recitation of its terms. The House version of the Act did not provide for a buildings conservation program, and the Senate version merely directed in precatory terms that federal agencies review their programs and policies to identify measures that could "better assure adequate supplies of energy to consumers, reduce energy waste, conserve natural resources, and protect the environment." *See generally* S.Conf.Rep. No. 516, 94th Cong., 1st Sess. 182–83 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 1762, 2023–25.

6. Exec. Order No. 11,912, § 1(b), 41 Fed.Reg. 15,825 (1976), *as amended by* Exec. Order No. 12,003, § 2, 42 Fed.Reg. 37,524–26 (1977).

7. Department of Energy Organization Act of 1977, § 301, Pub.L. No. 95–91, 91 Stat. 577 (codified at 42 U.S.C. § 7151 (Supp. V 1981)).

8. Exec. Order No. 12,003, § 2, 42 Fed.Reg. 37,-524–26 (1977).

9. *Id. See also* National Energy Conservation Policy Act of 1978, 42 U.S.C. §§ 8241–8261 (Supp. V 1981) (requiring, *inter alia,* retrofit by 1990 of energy-audited federal buildings and use of solar and other renewable energy sources in federal buildings).

10. 44 Fed.Reg. 65,707 (1979) (codified at 10 C.F.R. §§ 436.40–436.56 (1982)) ("Guidelines for Buildings Plans"). *See also* 45 Fed.Reg. 5624 (1980) (codified at 10 C.F.R. §§ 436.10–436.23 (1982)) ("Methodology and Procedures for Life Cycle Cost Analyses"); 44 Fed.Reg. 65,706 (1979) (codified at 10 C.F.R. §§ 436.30–436.34 (1982)) ("Procedures for Preliminary Energy Audits").

The DOE regulations, and the 10-year plan generally, are exempt from the Administrative Procedure Act's notice-and-comment rulemaking requirements. *See* 5 U.S.C. § 553(a)(2) (1976) (public property exemption); 42 U.S.C. § 6393 (1976) (exempting 10-year plan from APA rulemaking requirements); *infra* note 30.

11. *See, e.g.,* 10 C.F.R. § 436.48(c)(3) (1982) (mandating cost-benefit analyses of improvements in lighting efficiency); *id.* § 436.52(a) (incorporating 41 C.F.R. § 101–20.116–2 (1981) (establishing mandatory footcandle levels of illumination and ordering installation of more efficient lighting systems in remodeling and new construction projects)).

12. *See, e.g.,* 10 C.F.R. § 436.48(c)(1) (1982) (mandating cost-benefit analyses of improvements in ventilation efficiency); *id.* § 436.-48(c)(2) (same *re* heating and cooling systems); *id.* § 436.52(a) (incorporating *id.* §§ 490.11–490.18 ("Heating and Cooling Restrictions") and 41 C.F.R. § 101–20.116–3 (1981) (establishing temperature controls, mandatory use of window draperies and blinds to cut down heat losses, and ordering reductions in outside air intake)).

13. *See, e.g.,* 10 C.F.R. § 436.41 (1982) ("Energy conservation measure"); *id.* § 436.48(c)(1)–(6).

14. *See, e.g., id.* § 436.52(c) (requiring evaluation of policies and practices with respect to restrictions on hours of operation); *id.* § 436.-52(a) (incorporating *id.* § 490.14, 41 C.F.R. § 101–20.116–2 (1981), and *id.* § 101–20.116–3 (regulation of temperature and lighting during unoccupied periods)).

15. *See, e.g.,* provisions cited *supra* note 12.

retrofitting,[16] and other conditions of operation.[17] Six months later, DOE, with the concurrence of OMB, published a *Preliminary Ten-Year Buildings Plan (Preliminary Plan).*[18] That document notes federal energy conservation accomplishments since 1975, sets further specific goals for the period 1980–90, and incorporates the DOE guidelines for individual agency plans. The *Preliminary Plan* provides for periodic updating of both the individual and the overall plans; it also notes that, after evaluation and approval by DOE and OMB, the individual plans will be integrated into the *Preliminary Plan* to produce a *Final Ten-Year Buildings Plan (Final Plan).*[19]

Issuance of the *Final Plan* has recurrently been delayed by problems in developing the individual agency plans. Of the eighteen agency plans submitted to date, only one was approved by DOE as initially submitted. Ten more were approved after initial disapproval and revision. The other plans are in various stages of formulation and revision with DOE assistance.[20]

Appellants have not contested DOE's assertions that the buildings conservation program has contributed to significant reductions in agency energy consumption to date.[21] Although a number of agency plans have not yet been approved, thereby delaying publication of the *Final Plan,* DOE's buildings standards, and the procedures outlined in the *Preliminary Plan,* remain in effect in the interim.[22] Thus, independent of the existence of an approved individual plan, every covered agency is governed by DOE's auditing and reporting requirements,[23] must observe DOE standards with respect to new construction and leasing,[24] and must comply with mandatory lighting, temperature, and other requirements.[25]

16. *See, e.g.,* 10 C.F.R. § 436.48(e)–(f) (1982) (schedule of technical surveys for retrofit program); *id.* § 436.50 (retrofit program for existing federal buildings).

17. *See, e.g., id.* § 436.48(c)(4) (mandating cost-benefit analyses of improvements in water heating efficiency); *id.* § 436.48(c)(5) (same *re* improvements in maintenance and operation procedures); *id.* § 436.49 (operation and maintenance standards); *id.* § 436.52(a) (incorporating *id.* §§ 490.21–490.24 (regulation of hot water systems)).

18. FEDERAL ENERGY MANAGEMENT PROGRAM, U.S. DEP'T OF ENERGY, PRELIMINARY FEDERAL TEN-YEAR BUILDINGS PLAN (1980) [hereinafter cited as "PRELIMINARY PLAN"].

19. *Id.* at i–iii.

20. Supplemental Memorandum of Defendants-Appellees at 4 (filed Oct. 20, 1982). *See also* Affidavit of John W. Bethea, Chief, Federal Energy Management Program, ¶ 4 (Sept. 30, 1982), *submitted with* Supplemental Memorandum, *supra.*

21. DOE asserts that, under its guidance, federal agencies have reduced energy consumption in government buildings by 14.2% since Fiscal Year 1975. Supplemental Memorandum of Defendants-Appellees, *supra* note 20, at 3. *See also* Brief for Appellees at 7. Appellants respond that these "conservation achievements . . . actually underscore the need for—and the

probable effectiveness of—the statutorily required" *Final Plan.* Reply Brief for Appellants at 3. *But see infra* pp. 14–19.

22. Brief for Appellees at 9; *see infra* notes 23–25 and accompanying text.

23. *See* 10 C.F.R. §§ 436.10–436.23, 436.30–436.34, 436.48, 436.56 (1982).

24. On new construction, see *id.* § 436.51; *id.* § 436.52(b) (incorporating energy performance standards set forth in the Energy Conservation Standards for New Buildings Act of 1976, Pub.L. No. 94–385, 90 Stat. 1144 (codified at 42 U.S.C. § 6831 *et seq.* (1976 & Supp. V 1981)). The standards apply to any federal building "for which construction was not completed prior to November 9, 1978, and the design of which can be feasibly modified after the effective date of these Guidelines." 10 C.F.R. § 436.41 (1982). On new leasing, see Exec. Order No. 12,003, § 2(j), 42 Fed.Reg. 37,526 (1977); 10 C.F.R. § 436.44(e) (1982); *id.* § 436.52(a) (incorporating 41 C.F.R. § 101–20.-116–5 (1981)).

25. *See* 10 C.F.R. § 436.52 (1982) (incorporating, *inter alia, id.* § 490, 41 C.F.R. § 101–20.116 (1981), and the performance standards set forth in the Energy Conservation Standards for New Buildings Act of 1976, Pub.L. No. 94–385, 90 Stat. 1144 (codified at 42 U.S.C. § 6831 *et seq.* (1976 & Supp. V 1981)); PRELIMINARY PLAN, *su-*

## B. *The District Court Action*

Appellants filed this action on April 3, 1980, requesting declaratory and injunctive relief that would compel DOE and OMB "to develop and implement the Ten Year Plan for energy conservation in federal buildings as required by 42 U.S.C. § 6361(a)(2)." [26] The complaint asserts that Common Cause's 220,000 members, "[a]s consumers in the marketplace for energy resources, . . . compete with the government" for available supplies.[27] Implementation of the ten-year plan, the complaint states, "would reduce energy consumption in federal buildings by at least 31 million barrels of oil per year, at a cost savings of over $900 million per year." [28] Citing the government's alleged

failure to act on such a plan, the complaint claims as an injury that "plaintiffs have been harmed by suffering a shortage of energy resources and higher energy prices due to consumption of energy by the Federal government which is wasteful and contrary to law." [29]

DOE and OMB raised a variety of defenses, including, *inter alia,* that (1) the district court lacked jurisdiction over the subject matter of the complaint, (2) appellants did not have standing, and (3) measures taken pursuant to section 6361(a)(2) had rendered the controversy moot. Without addressing the issue, the district court apparently assumed that it had subject matter jurisdiction.[30] After appellants initiated discovery

---

pra note 18, at 4–4 to 4–5 (interim mandatory standards).

**26.** Complaint ¶ 1, Common Cause v. Department of Energy, Civ. No. 80–0856 (D.D.C.) (filed Apr. 3, 1980) [hereinafter cited without cross-reference as "Complaint"], *reprinted in* JA at 3–4.

**27.** *Id.* ¶ 4, *reprinted in* JA at 4.

**28.** *Id.* ¶ 20, *reprinted in* JA at 7. The 31-million barrel figure was derived from DOE estimates of the anticipated savings to be realized from fully achieving President Carter's percentage reduction goals. *See* Brief for Appellants at 10, 12–13; *see also* FEDERAL ENERGY MANAGEMENT PROGRAM, U.S. DEP'T OF ENERGY, ENERGY MANAGEMENT IN THE FEDERAL GOVERNMENT, ANNUAL REPORT 9 (1979).

**29.** Complaint ¶ 2, *reprinted in* JA at 4. The complaint grounded its cause of action on the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1976 & Supp. V 1981), arguing that failure to develop a plan constituted agency inaction unlawfully withheld and unreasonably delayed under *id.* § 706(1). *See* Complaint ¶ 21, *reprinted in* JA at 7.

**30.** Appellees argue on appeal that EPCA altogether precludes judicial review of executive action under section 6361(a)(2), thereby barring appellants' cause of action under the APA. *See* 5 U.S.C. § 701(a)(1) (1976). It is well-established that the APA's "strong presumption of reviewability" can be rebutted only by evidence demonstrating a "clear and convincing legislative intent to negate review." *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043 (D.C.Cir.1979); *see also Morris v. Gressette,* 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977).

Appellees offer three elements of EPCA that, they claim, constitute such clear and convincing evidence. First, they note that 42 U.S.C. § 6395(e) (1976), which establishes private rights of action for violations of six of EPCA's provisions, does not include section 6361(a)(2) among the cited provisions. A private right of action, however, is addressed to suits by private litigants *against private parties* allegedly acting in violation of a statutory command. *See* S.CONF.REP. No. 516, *supra* note 5, at 213–14, *reprinted in* 1975 U.S.CODE CONG. & AD.NEWS 2055–56. The instant action, seeking judicial redress of alleged *administrative* misconduct, is a distinct form of proceeding; EPCA makes clear that agency action is subject to judicial review. *See* 42 U.S.C. § 6393 (1976).

Appellees observe, second, that section 6361(c) provides for annual reports to Congress on the progress of the buildings plan. Congress frequently inserts such reporting requirements, however; a provision for annual reports does not begin to approach "clear and convincing" evidence of a legislative intent to bar judicial review.

Appellees note, finally, that 42 U.S.C. § 6393 (1976), which extends APA rulemaking requirements to a number of rules, regulations, and orders enacted pursuant to EPCA, does not apply to section 6361(a)(2). Again, however, the fact that the 10-year plan is not subject to notice-and-comment rulemaking requirements does not sufficiently indicate a congressional intent to bar judicial review altogether.

Our conclusion is reinforced by reference to 42 U.S.C. § 6362(b) (1976), which directs five federal agencies to issue "energy impact statements" in connection with any "major regulatory action." Although the arguments advanced by appellees above in connection with section 6361(a)(2) would apply in full force to this section as well, courts routinely scrutinize agency compliance with the "energy impact

with respect to the mootness issue, however, the district court ordered the parties to focus solely on the question of standing.[31]

On the government's motion to dismiss, the district court held that appellants lacked standing. The court apparently assumed that judicial relief would lead to reduced government consumption of energy, and focused instead on the question whether such reduction would in turn tangibly benefit the consuming public.[32] After surveying recent standing decisions by the Supreme Court and our own court of appeals, the court announced the principle, "established beyond a doubt," that where consumers allege marketplace injury arising from government illegality, they must demonstrate that the government *sufficiently control[s] the relevant market* so that relief will not be merely speculative."[33] The court concluded that the energy marketplace "is beyond the ability of the defendants to control," noting that "[p]laintiffs, as are we all, are well aware of the myriad

forces that cause shortages in the energy marketplace ranging from price rises by OPEC and international politics to the weather. Indeed, the energy resources marketplace is exceedingly complex, if not one of the most complex."[34] Finding that government conservation would itself be unlikely to lower prices or increase available supplies, the court dismissed.

## II. DISCUSSION

Article III of the Constitution limits the federal judiciary's role to the resolution of "cases or controversies." In its constitutional guise, standing doctrine is one component of this case-or-controversy requirement.[35] At its "irreducible minimum,"[36] the Article III standing requirement demands that a plaintiff properly allege (1) and "injury in fact" to his own interests, that (2) is "fairly traceable" to the defendant's conduct, and that (3) is sufficiently likely to be redressed in a tangible way by available judicial relief.[37]

---

statement" requirement. *See, e.g., Mercury Motor Express, Inc. v. United States,* 648 F.2d 315, 320 (5th Cir.1981); *American Trucking Ass'n, Inc. v. United States,* 642 F.2d 916, 924 (5th Cir.1981); *Delta Air Lines, Inc. v. CAB,* 561 F.2d 293, 302–06 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 796 (1978).

**31.** *Common Cause v. Department of Energy,* Civ. No. 80–0856 (D.D.C. July 2, 1980) (granting protective order) ("[T]o find the issue moot we would have to find that the defendants complied with the Energy Policy and Conservation Act mandate at issue and, consequently, we would have reached the merits.").

**32.** District Court Opinion at 2, 6–7, *reprinted in* JA at 18, 22–23.

**33.** *Id.* at 6, *reprinted in* JA at 22.

**34.** *Id.* at 6–7, *reprinted in* JA at 22–23.

**35.** Standing doctrine also embodies nonconstitutional, "prudential" considerations. These include the requirement that a plaintiff's complaint be "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *see also Community Nutrition Inst. v. Block,* 698 F.2d 1239, 1245, 1249–1251 (D.C.Cir.1983). Courts have also expressed reluctance to adjudicate

"'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975)).

In the instant case, the district court held that the "generalized grievance" restriction, as well as Article III requirements, barred appellants' standing. *But compare Community Nutrition Inst. v. Block, supra,* at 1251–1252. Our decision today does not require that we address the prudential question.

**36.** *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., supra* note 35, 454 U.S. at 472, 102 S.Ct. at 758.

**37.** *Id.; see also Bryant v. Yellen,* 447 U.S. 352, 366–68, 100 S.Ct. 2232, 2240–41, 65 L.Ed.2d 184 (1980); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72–78, 98 S.Ct. 2620, 2630–2633, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37–39, 40–46, 96 S.Ct. 1917, 1923–1924, 1925–1928, 48 L.Ed.2d

The question of consumer standing presents especially difficult conceptual hurdles. It is settled law that standing may be grounded on a mere "trifle";[38] settled, too, that the widespread character of an alleged injury does not demean the standing of those who are in fact injured.[39] Yet where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses.[40]

The instant controversy, as framed by the parties and the district court, presents a paradigm of this difficulty. The government and the court below view this case as one of third-party causation falling squarely within the ambit of *Warth v. Seldin*[41] and its progeny.[42] In such cases, the plaintiff seeks to change the defendant's behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury. Viewed in this manner, appellants' suit to compel reduction in government consumption is merely designed to leverage third-party fuel suppliers into making pricing and allocation decisions favorable to the consuming public. Appellees argue that because energy is not an elastic commodity, and because the ten-year plan will lead only to the most marginal reduction in overall national consumption, the possibility of effective redress is altogether too speculative to support standing.

Appellants respond that consumption by the federal government, the nation's single largest energy user, has a substantial impact on the energy market.[43] They argue that, although many factors combine to produce shortages and high prices of energy products, "each cause is independent and contributes *directly* to a separate injury."[44] In other words, illegal government consumption "contributes to the shortage for consumers no matter how any third party acts or doesn't act, and no matter how many other factors independently contribute to the shortage."[45] Appellants there-

---

450 (1976); *Warth v. Seldin, supra* note 35, 422 U.S. at 498–501, 95 S.Ct. at 2205–2206; *Consumers Union of U.S., Inc. v. Federal Trade Comm'n,* 691 F.2d 575, 577 n. 9 (D.C.Cir.1982) (en banc).

**38.** *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416 n. 14, 37 L.Ed.2d 254 (1973) (quoting Davis, *Standing: Taxpayers and Others,* 35 U.Chi.L.Rev. 601, 613 (1968); *see also Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 714 (D.C.Cir.1977).

**39.** *See, e.g., United States v. SCRAP, supra* note 38, 412 U.S. at 686–88, 93 S.Ct. at 2415–16; *Community Nutrition Inst., Inc. v. Block, supra* note 35, at 1251; *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1008 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978).

**40.** Courts and commentators are divided over the proper contours of causation/redressability analysis in the market context. *Compare, e.g., Community Nutrition Inst. v. Block, supra* note 35, at 1247–1249; *Energy Action Educ. Found. v. Andrus,* 654 F.2d 735, 756–57 n. ** (D.C.Cir. 1980), *rev'd on other grounds,* 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *American Soc'y of Travel Agents, Inc. v. Blumenthal,* 566 F.2d 145, 155–60 (D.C.Cir.1977) (Bazelon, C.J., dissenting), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978); and K.C. Davis, 1982 Supplement to Administrative Law Treatise § 22.02–12, at 352–53 (1982) *with American Soc'y of Travel Agents, Inc. v. Blumenthal, supra,* 566 F.2d at 148–50; *Starbuck v. City and County of San Francisco,* 556 F.2d 450, 457–58 (9th Cir.1977).

**41.** *Supra* note 35, 422 U.S. at 504–08, 95 S.Ct. at 2208–10.

**42.** *See, e.g., Simon v. Eastern Ky. Welfare Rights Org., supra* note 37, 426 U.S. at 40–46, 96 S.Ct. at 1925–1928; *Winpisinger v. Watson,* 628 F.2d 133, 137–39 (D.C.Cir.1980); *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258, 264–66 (D.C.Cir.1980).

**43.** The federal government is responsible for just over two percent of the nation's energy consumption. The 520,000 buildings owned or leased by the government are responsible for more than half of total federal consumption. In other words, federal building consumption accounts for approximately one percent of all energy consumed in the United States. *See* Brief for Appellants at 3–4 (citing Federal Energy Management Program, U.S. Dep't of Energy, Federal Energy Conservation Programs 1–8 (1980)).

**44.** Brief for Appellants at 16 (emphasis in original).

**45.** *Id.*

fore rely heavily on "the stuff of the most elementary economic texts":[46] a belief that the laws of supply and demand govern, at least to some extent, the operation of the energy marketplace.

The circumstances of the instant case do not require us to wade into this morass of marketplace analyses. The court below focused on the question whether government conservation would result in a pocketbook benefit to the consuming public. That inquiry, however, assumes that available judicial relief in the instant case would be likely to produce further reductions in government energy consumption. Such an assumption is conjectural at best, and therefore cannot support standing.

Appellants concede, as they must, the existence of the DOE building regulations and of the *Preliminary Plan.*[47] Stripped of surplusage, the gravamen of their complaint is therefore that the government's failure to publish the *Final Plan* violates section 6361(a)(2). In their reply brief and supplemental memoranda, appellants recognize that the precise relief they seek is a judicial decree ordering issuance of the *Final Plan.*[48] We assume, for the sake of standing analysis, that publication of the *Final Plan* is necessary to achieve full compliance with section 6361(a)(2). We assume, too, that a decree ordering such action would be a proper exercise of judicial power. What we cannot assume, and what appellants have utterly failed to indicate, is how a decree ordering publication of the *Final Plan* would be likely to lead to tangible additions in federal energy conservation above and beyond those currently being achieved under the regime of the *Preliminary Plan.*[49]

The scope of such a decree would perforce be exceedingly narrow. The buildings plan is exempt from the procedural notice-and-comment rulemaking requirements of the Administrative Procedure Act.[50] Beyond enumerating six areas that must be addressed in the buildings plan,[51] section 6361(a)(2) sets no guidelines for structuring, implementing, or coordinating the plan. Nor does the statute set any targets for reductions in consumption. The thirty-one million barrel conservation figure, cited by appellants in their complaint as the anticipated benefit of a judicial decree, is based on President Carter's energy conservation goals.[52] Those goals, however, are entirely

---

**46.** *American Soc'y of Travel Agents, Inc. v. Blumenthal, supra* note 40, 566 F.2d at 145, 157 (Bazelon, C.J., dissenting).

**47.** *See* District Court Opinion at 2, *reprinted in* JA at 18.

**48.** Reply Brief for Appellants at 2–3; Appellants' Supplemental Memorandum at 2, 4 (filed Sept. 21, 1982); *id.* at 5 ("The only action by the Department which could [comply with the statute] is the promulgation of a *final* ten-year buildings plan ... preliminary draft plans [are] no substitute ....") (emphasis added); Appellants' Supplemental Reply Memorandum at 4 (filed Oct. 27, 1982).

**49.** In reviewing the district court's dismissal, we must of course construe the complaint in the light most favorable to appellants. *Warth v. Seldin, supra* note 35, 422 U.S. at 501, 95 S.Ct. 2206. Mere allegations will ordinarily suffice, but if controverted by the defendant, the plaintiff *must* indicate the existence of facts supporting his allegations. *See, e.g., Physicians' Educ. Network, Inc. v. Department of Health, Educ. & Welfare,* 653 F.2d 621, 626 (D.C.Cir.1981); *Public Citizen v. Lockheed Aircraft Corp., supra* note 38, 565 F.2d at 714 n. 22. Appellants conceded below the issuance of

the DOE regulations and the *Preliminary Plan.* It was therefore incumbent upon them to indicate how publication of the *Final Plan* could reasonably be expected to lead to accelerated federal energy conservation. This they have failed to do, relying instead upon the sort of "unadorned speculation" that courts have consistently rejected in making standing determinations. *Simon v. Eastern Ky. Welfare Rights Org., supra* note 37, 426 U.S. at 44, 96 S.Ct. at 1927; *see also Physicians' Educ. Network, Inc. v. Department of Health, Educ. & Welfare, supra,* 653 F.2d at 623–24; *North Carolina Utils. Comm'n v. Federal Energy Regulatory Comm'n,* 653 F.2d 655, 667–68 (D.C.Cir.1981); *Metcalf v. Petroleum Council,* 553 F.2d 176, 183–87 (D.C.Cir.1977).

**50.** *See supra* notes 10, 30.

**51.** *See supra* text accompanying note 5.

**52.** *See supra* note 8 and accompanying text. It is somewhat incongruous for appellants to allege a 31-million barrel injury—the anticipated difference between *no* conservation program and the 10-year plan—while at the same time acknowledging that conservation pursuant to

the creatures of executive discretion, and could be calibrated at a higher level, or at a much lower level. Given the wide discretion that Congress delegated to the executive branch, the most that a court could decree would be (1) issuance of a *Final Plan,* that (2) governed buildings owned and leased by the federal government, and (3) included conservation measures addressed to the six areas enumerated in the statute.

Measures taken pursuant to the *Preliminary Plan* and the DOE regulations *already* govern both owned and leased property,[53] and *already* address the six enumerated areas.[54] It is true that a number of agencies have yet to secure DOE approval of their individual buildings plans. In the interim, however, those agencies must continue to comply fully with DOE regulations, including, *inter alia,* the auditing and reporting requirements, the leasing and construction restrictions, and the mandatory standards governing lighting, heating, and other conditions of operation.[55] Appellants have offered us no reason to believe that the mere embodiment of these regulations in a document denominated "final" would in any way accelerate the reductions in consumption already achieved.

We have combed the record in vain for any plausible assertion by appellants that the current structure of the buildings conservation program falls short of section 6361(a)(2)'s requirements, *beyond* DOE's failure to publish a "finalized" version of its plan. We found three possible objections to the *Preliminary Plan,* all proffered in passing by appellants in a motion pertaining to their initial discovery efforts.[56] Appellants appeared to suggest, first, that the "decentralized" focus of the plan—requiring individual agency plans in conformity with DOE regulations—may not comport with the concept of a mandatory "government-wide" plan.[57] Given the broad discretion Congress gave to the executive branch,[58] however, this suggestion is patently frivolous.

Second, appellants questioned the adequacy of the *Preliminary Plan*'s lighting and thermal standards.[59] DOE has stated that the *Final Plan* will include revised lighting and thermal standards;[60] mandatory standards are already in effect,[61] however, and there is no indication that the final standards will be more stringent. In any event, the proper calibration of those standards is a matter within the executive's discretion.

Finally, appellants queried "whether the current government plan covers federally leased, as well as federally owned, buildings, and if not, why not."[62] Reference to the DOE regulations and the *Preliminary Plan* manifestly demonstrates that the

the DOE guidelines and *Preliminary Plan* has achieved significant progress toward meeting the 31-million barrel goal. *See supra* note 21 and accompanying text.

53. *See supra* notes 10–19, 22–25, and accompanying text; *infra* note 63 and accompanying text.

54. *See supra* notes 11–17 and accompanying text.

55. *See supra* notes 22–25 and accompanying text.

56. *See* Memorandum in Opposition to Defendants' Motion for a Protective Order (filed July 1, 1980) [hereinafter cited as "Memorandum in Opposition"].

57. *Id.* at 3–4.

58. *See supra* notes 50–52 and accompanying text.

59. Memorandum in Opposition, *supra* note 56, at 3.

60. *See* PRELIMINARY PLAN, *supra* note 18, at i, 4–4 to 4–5; Supplemental Memorandum of Defendants-Appellees, *supra* note 21, at 4 (revisions will "allow the mandatory federal thermal and lighting efficiency standards to incorporate commercial standards voluntarily developed by private industry").

61. *See* PRELIMINARY PLAN, *supra* note 18, at 4–4 to 4–5 (setting forth mandatory interim standards); *supra* notes 11–12 and accompanying text.

62. Memorandum in Opposition, *supra* note 56, at 3.

buildings plan fully extends to both current and new federal leasing.[63]

■ All that remains, then, is a bare assertion that the *Preliminary Plan* is "no substitute" for the *Final Plan*.[64] In the absence of any indication that the *Final Plan* will likely yield tangible, *additional* savings in consumption beyond those being achieved pursuant to the *Preliminary Plan,* appellants have failed to meet one of the touchstone components of the standing requirement: a demonstration that the claimed injury is likely to be redressed by available judicial relief.[65]

The "vitality" of the redressability requirement has been "repeatedly reaffirmed."[66] The requirement serves to limit the judicial role to measures that will produce tangible, meaningful results in the real world. By preventing courts from "rummaging aimlessly through the policy decisions of the elected branches in search of defective government action,"[67] it acts as an important check upon the power of the judiciary in our scheme of coordinate government branches.[68] We would not commend appellees on the glacial pace of their efforts to implement section 6361(a)(2).[69] But given (1) the limited scope of available judicial relief, and (2) the range of conservation programs already implemented pursuant to section 6361(a)(2), the question whether publication of the *Final Plan* will likely lead to further tangible savings is altogether too speculative to support invocation of the judicial power.[70] We therefore need not reach the question whether such savings, if realized, would accrue to the pocketbook benefit of the consuming public.[71]

63. *See, e.g.,* Exec. Order No. 12,003, § 2(j), 42 Fed.Reg. 37,526 (1977); 10 C.F.R. § 436.44(c) (1982); *id.* § 436.44(e); *id.* § 436.48(g); *id.* § 436.49(b); *id.* § 436.50(c); *id.* § 436.51(d); *id.* § 436.52(a) (incorporating 41 C.F.R. § 101–20.116–5 (1981)).

64. Appellants' Supplemental Memorandum, *supra* note 48, at 5.

65. *See* cases cited *supra* notes 36–37, 40; *Physicians' Educ. Network, Inc. v. Department of Health, Educ. & Welfare, supra* note 49, 653 F.2d at 623–24.

66. *North Carolina Utils. Comm'n v. Federal Energy Regulatory Comm'n, supra* note 49, 653 F.2d at 667 (citations omitted).

67. Note, *The Generalized Grievance Restriction: Prudential Restraint or Constitutional Mandate?,* 70 GEO.L.J. 1157, 1166 (1982).

68. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., supra* note 35, 454 U.S. at 473–74, 102 S.Ct. at 759; *Gladstone, Realtors v. Village of Bellwood, supra* note 37, 441 U.S. at 99, 99 S.Ct. at 1607; *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).

69. The pace and scope of DOE's federal conservation efforts have been criticized by a number of legislators. *See, e.g., Wasted Energy Dollars in the Federal Government: Hearings Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce,* 97th Cong., 1st Sess. 99–108 (1981); H.R.REP. No. 586, 96th Cong., 1st Sess. (1979). Contrary to appellants' apparent reasoning, however, the fact that DOE has drawn criticism does not establish that available *judicial* relief could accelerate the pace or broaden the scope of the buildings conservation program.

70. This case is therefore distinguishable from our previous decisions sustaining standing in marketplace contexts. In those cases, the allegedly illegal government actions—a price-support payment system, a cash-bonus bidding system, a tax subsidy, and so forth—unquestionably affected the business costs of the relevant producers and suppliers. The issue presented by those cases was whether removal of the alleged illegalities, and the accompanying alterations in costs, would *in turn* have a discernible impact on the operations of the relevant markets. *See, e.g., Community Nutrition Inst. v. Block, supra* note 35, at 1247–1249 (dairy price-support payment system); *Energy Action Educ. Found. v. Andrus, supra* note 40, 654 F.2d at 756–57 n. ** (offshore oil-drilling cash-bonus bidding system); *cf. Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 138 (D.C.Cir.1977) (tax subsidy to competitor of oil producer meets injury-in-fact requirement; standing denied under zone-of-interests test), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

71. On appeal, appellants briefly raise an additional theory of standing: that federal conservation efforts will have a beneficial "ripple effect on the private sector that may well increase the amount of energy conserved there." Brief for Appellants at 10 n. *. For example, appellants suggest that federal design and con-

CONCLUSION

For the reasons set forth above, the district court's judgment dismissing appellants' complaint is

*Affirmed.*

J. Willard NALLS, Jr., as Administrator for the Estate of John C. Abraham, Deceased,

v.

ROLLS–ROYCE LIMITED, Appellant Aerospatiale (SNIAS) (Societe National Industrielle Aerospatiale), et al.

Carol E. RAMAMURTI, as Administratrix for the Estate of Chinni P. Ramamurti

v.

ROLLS–ROYCE LIMITED, Appellant Aerospatiale (SNIAS) (Societe National Industrielle Aerospatiale), et al.

Carol E. RAMAMURTI, as Administratrix for the Estate of Chinni P. Ramamurti

v.

ROLLS–ROYCE LIMITED, et al., Air India, Inc., Appellant.

Nos. 82–1975, 82–1976 and 82–2033.

United States Court of Appeals, District of Columbia Circuit.

March 8, 1983.

Certiorari Denied May 31, 1983.
See 103 S.Ct. 2444.

## ON DENIAL OF REHEARING EN BANC

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, MacKINNON, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, BORK and SCALIA, Circuit Judges.

### ORDER

PER CURIAM.

The suggestion for rehearing *en banc* of Rolls-Royce Limited has been circulated to the full Court. A majority of the members of the Court have not voted in favor thereof. On consideration of the foregoing, it is

ORDERED by the Court *en banc* that the suggestion is denied.

Circuit Judges MacKINNON and WILKEY would grant the suggestion for rehearing *en banc.* A statement of Circuit Judge WILKEY is attached.

*Statement as to Reasons for Voting for En Banc Consideration*

WILKEY, Circuit Judge, with whom joined MacKINNON, Circuit Judge:

Appellants ask us to review the district court's decision not to dismiss the suit against them on *forum non conveniens* grounds. Two judges of the motions panel considering the appeal, without opinion, dismissed for lack of jurisdiction. I believe that justice requires consideration of the *forum non conveniens* and appealability issues presented by this case by a merits panel or, failing that, *en banc.*

### I. *Forum non conveniens* ISSUES

As the district court acknowledged, defendants' *forum non conveniens* motion presents a difficult legal question. We set forth the applicable standard for *forum non*

struction standards can serve as a "showcase" that will encourage conservation among private architects, suppliers, and contractors, leading to additional savings that will accrue to the benefit of the consuming public. These allegations are grounded upon the sort of third-party causal nexuses that courts have consistently

---

held to be insufficient to support standing. *See* cases cited *supra* notes 41–42.