Trisha T. PRITIKIN, Plaintiff–Appellant,

v.

DEPARTMENT OF ENERGY, John D. Wagoner, in his official capacity as manager of DOE Richland Operations, and Spencer Abraham,[1] in his official capacity as Secretary of the U.S. DOE, Defendants–Appellees.

No. 99–35581.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 2001

Filed June 13, 2001

---

1. Spencer Abraham is substituted for his predecessor, Frederico Pena, as Secretary of the Department of Energy. Fed. R.App. P. 43(c)(2).

Tom H. Foulds, Tom H. Foulds & Associated Counsel, Seattle, Washington, for the plaintiff-appellant.

David C. Shilton (argued), Department of Justice, Washington, D.C., for the defendants-appellees.

Greer S. Goldman (on brief), Department of Justice Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Before: REINHARDT, WARDLAW, and GOULD, Circuit Judges.

WARDLAW, Circuit Judge:

Trisha T. Pritikin appeals the district court's entry of summary judgment in favor of the Department of Energy ("DOE"). Pritikin sued DOE to compel it to budget

for the medical monitoring program that the Agency for Toxic Substances and Disease Registry ("ATSDR") was required to institute at the Hanford Nuclear Reservation ("Hanford"). The district court concluded that it lacked subject matter jurisdiction on two grounds: (1) Pritikin failed to meet the requirements for instituting a citizen's suit under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9659(a)(1) and (2) ("CERCLA"); and (2) there was no final agency action to challenge under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"). We agree that we lack jurisdiction to entertain this action, but rely on a third ground: Pritikin lacks constitutional standing to compel DOE to make budget requests and to reprogram existing funds for the medical monitoring program because she cannot show that its failure to do so is the cause of the injury she seeks to redress or that requiring DOE to do so will result in ATSDR's implementation of the medical monitoring program. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. Factual Background

The Hanford Nuclear Reservation in Richland, Washington, is owned by DOE and was established in 1943 as part of the Manhattan Project to produce plutonium for nuclear weapons. For three decades, radioactive, toxic and hazardous substances were released from Hanford as by-products of the plutonium production process. From 1944 to 1957, it is estimated that 700,000 to over 1.1 million curies of radioactive iodine–131 were emitted into the air through exhaust stacks, and more that 22 million curies of radioactive material were released into the Columbia River during the cooling process. These releases exposed thousands of persons living and working downwind and downstream from the site to radioactive iodine. The most damaging exposure to radioactive iodine–131 occurred through the consumption of contaminated milk, produced by cows grazing in contaminated fields. Human exposure to radioactive iodine–131 often results in thyroid disease, as the toxic chemical is usually stored in the thyroid gland.

In 1989, the Environmental Protection Agency ("EPA") placed the Hanford site on its National Priorities List ("NPL"), which ranks the most serious hazardous waste sites in the United States, and since that time, Hanford has been the subject of an environmental cleanup. To expedite the clean-up, ATSDR and DOE entered into a Memorandum of Understanding ("MOU") and a series of Interagency Agreements ("IAGs") to delineate the responsibilities of the respective agencies as well as to provide funding for the ATSDR's statutorily required health assessment activities at the Hanford site for fiscal years ("FY") 1991–1996. In 1994, as part of a negotiation during the pendency of the appeal of *Hanford Downwinders Coalition Inc. v. Dowdle*, 841 F.Supp. 1050, *aff'd*, 71 F.3d 1469 (9th Cir.1995),[2] ATSDR initiated a formal review of the health effects of hazardous substances at Hanford. In 1997, ATSDR concluded that there was "a significant increased risk of adverse health effects in humans from exposure to hazardous substances" due to

---

**2.** The Hanford Downwinders Coalition sought injunctive relief requiring ATSDR to initiate a health surveillance program (also known as a medical monitoring program) for people exposed to the toxic substances emitted from Hanford. On appeal, we concluded that although ATSDR had a mandatory duty under 42 U.S.C. § 9604(i)(9) to implement a medical monitoring program once it determined that "a significant increased risk of adverse health effects" existed at Hanford, we lacked jurisdiction to order such a program because the requisite determination had not yet been made. *Dowdle*, 71 F.3d at 1474–75.

toxic waste exposure. Once this "significant risk" determination was made, 42 U.S.C. § 9604(i)(9) required ATSDR to implement a medical monitoring program to screen the population for those diseases for which the risk had been significantly increased and to refer affected individuals to treatment. 42 U.S.C. § 9604(i)(9).

In February of that same year, DOE transferred the Hanford funding responsibility from its headquarters to a field office in Richland.[3] Following the transfer, in a letter dated October 10, 1997, John Wagoner, manager of the DOE–Richland Operations Office, informed ATSDR that DOE could not "accept the funding burden specified in [the August 11, 1997] draft IAG."[4] Explaining that the regional office could not accept "unfunded mandates" from DOE Headquarters and its belief that it is "unacceptable for DOE to fund non-Environmental Management activities with Environmental Management funds," Wagoner specifically requested that ATSDR help DOE "engage the Administration on the issue of funding." As an interim measure, Wagoner requested that ATSDR identify the minimum funding levels it needed to begin work in FY 1998. ATSDR and DOE–Richland never reached an agreement, and as a result, no IAGs were established after FY 1996. In early March, Pritikin served her Notice of Intent to Sue, dated January 13, 1998. Approximately one week later, on March 19, 1998, DOE announced its intent to transfer $5 million from another appropriation toward funding the medical monitoring program. DOE did not include funding for ATSDR's medical monitoring program in its budget proposal for FY 1999, and ATSDR has yet to begin the statutorily required medical monitoring program.

Trisha T. Pritikin was born in Richland, Washington, near the Hanford facility, in 1950, and she lived there for the first ten years of her life. As a result of in utero and childhood exposure, Pritikin's thyroid gland and endocrine system were severely damaged. Thus, she is qualified to participate in ATSDR's medical monitoring program. She initiated this suit to force ATSDR to implement the statutorily required program. Pritikin believes that if DOE were to first request and then provide the funding, ATSDR would begin the medical monitoring program, and her medical needs would then be addressed.

## II. Statutory History

To understand why Pritikin does not have standing to bring this cause of action against DOE, it is necessary to understand the statutory framework of CERCLA[5]— and, in particular the responsibilities it imposes on the different agencies involved in the clean-up of a toxic waste site. CERCLA was enacted to " 'protect and preserve public health and the environ-

---

**3.** This transfer was announced in a memorandum from Alvin L. Alm, DOE Assistant Secretary for Environmental Management, on February 27, 1997. Because "[f]unding this compliance program from Headquarters [was] no longer possible given the congressional budget decision with respect to the Program Direction Account[,]" the program was "moved from Headquarters to the field for funding and execution." Attached to the memorandum was a model IAG, but it is unclear from the record whether that model IAG was the same draft IAG submitted to the

Richland field office by ATSDR in August 1997.

**4.** The 1997 draft IAG was proposed by ATSDR after Richland had assumed responsibility for funding the Hanford program. All previous IAGs were entered into between ATSDR and DOE Headquarters.

**5.** 42 U.S.C. §§ 9601–9675, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA, Pub.L. No. 99–499, 100 Stat. 1613) (1986).

ment' by facilitating the expeditious and efficient cleanup of hazardous waste sites." *Dowdle*, 71 F.3d at 1473–74 (quoting *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989)). CERCLA establishes a procedure to facilitate hazardous waste site clean-ups and insures that whoever undertakes the clean-up can recover those costs from potentially responsible parties ("PRPs"). 42 U.S.C. §§ 9604, 9606, 9607, and 9620. Here, DOE qualifies as a PRP under § 9607(a)(4) because, as the owner of the Hanford site, it accepted hazardous substances for transport.

The 1986 Superfund Amendments and Reauthorization Act ("SARA") established ATSDR within the Department of Health and Human Services to assess and study the health effects of hazardous substances and to institute medical programs when needed. 42 U.S.C. §§ 9604(i). The PRPs are liable for, among other things, "the costs of any health assessment or health effects study carried out under section 9604(i)," and liability attaches even if the PRP was unaware of the toxic waste at the time in question. 42 U.S.C. § 9607(a)(4)(D). Thus, DOE is liable for the cost of any medical monitoring program that ATSDR "carried out" at Hanford. CERCLA also allows Superfund money to be used to finance the clean-up and provides a cause of action for its reimbursement from PRPs. 42 U.S.C. §§ 9607(a) and 9611(a). Section 9620 waives the federal government's sovereign immunity and makes those federal departments and agencies which qualify as PRPs subject to § 9607 liability. Section 9620 also requires the head of the each respon-

sible federal department to (1) enter into an IAG with the EPA administrator to expedite the completion of all necessary remedial action; (2) submit a review of alternative agency funding for the remedial action in its annual budget to Congress; and (3) submit an annual progress report. 42 U.S.C. § 9620.

### III. Prior Proceedings

Pritikin brought this action against DOE pursuant to the Citizen Suit provisions of CERCLA, 42 U.S.C. § 9659(a)(1) and (2), and the APA, 5 U.S.C. § 701, *et seq.* She seeks a declaration that DOE is liable for funding ATSDR's medical monitoring program and an injunction compelling DOE to (i) include in its budget requests the amounts necessary to fully fund the Hanford medical monitoring program and disease registry program for FY 1999 and beyond; (ii) reprogram budget items committed to it for other programs or by special appropriation in its FY 1998 budget to cover the full amounts planned by ATSDR for its Hanford program; and (iii) to comply with CERCLA reporting requirements and disclose to Congress its failures to fund ATSDR's mandatory programs and to reach IAGS with ATSDR. DOE moved for dismissal pursuant to Fed. R.Civ.P. 12(b)(6), or in the alternative, for summary judgment for lack of subject matter jurisdiction.

Neither party raised the issue of standing in the district court. As a result, the district court granted DOE's motion for summary judgment without addressing whether Pritikin had constitutional standing to initiate her suit against DOE. It rejected citizen suit[6] jurisdiction on the

---

6. 42 U.S.C. § 9659 provides in relevant part:

 (a) Authority to bring civil suits
 any person may commence a civil action on his own behalf—

(1) against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in viola-

ground that Pritikin could not establish a § 9659(a)(1) "requirement" or a § 9659(a)(2) "duty" which DOE had either violated or failed to perform. Alternatively, the district court determined that it did not have subject matter jurisdiction under the APA because there was neither "final agency action" nor a "definitive statement of an agency's position" for which judicial review is authorized under 5 U.S.C. § 704.[7]

## IV. Standing

We review an order granting summary judgment *de novo, Auvil v. CBS "60 Minutes,"* 67 F.3d 816, 819 (9th Cir. 1995), and we may affirm the district court on any ground supported by the record, *Franklin v. Terr,* 201 F.3d 1098, 1100 n. 2 (9th Cir.2000). Although the issue of standing was not raised in the district court, because it is one of jurisdiction, we may consider it for the first time on appeal. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Alameda Newspa-pers, Inc. v. City of Oakland,* 95 F.3d 1406, 1411 n. 5 (9th Cir.1996).

Standing is a judicially-created doctrine—"an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Standing, unlike other jurisdictional doctrines, " 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.' " *Id.* at 38, 96 S.Ct. 1917 (quoting *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)). To demonstrate standing, a plaintiff must (1) "have suffered an 'injury in fact'—an

---

tion of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter (including any provision of an agreement under section 9620 of this title, relating to Federal facilities); or

(2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency and the administrator of the ATSDR) where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter, including an act or duty under section 9620 of this title (relating to Federal facilities), which is not discretionary with the President or such other officer.

. . .

(c) Relief

The district court shall have jurisdiction in actions brought under subsection (a)(1) of this section to enforce the standard, regulation, condition, requirement, or order concerned (including any provision of an agreement under section 9620 of this title), to order such action as may be necessary to correct the violation, and to impose any civil penalty provided for the violation. The district court shall have jurisdiction in actions brought under subsection (a)(2) of this section to order the President or other officer to perform the act or duty concerned.

7. 5 U.S.C. § 704 provides:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural or hypothetical;" ' " (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;' " and (3) "it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citations omitted) (alterations in original).

 DOE does not challenge the first prong of the standing requirements and rightfully so—Pritikin's inability to receive medical screening due to ATSDR's failure to implement the Hanford medical monitoring program establishes a cognizable injury. DOE argues, however, that because Pritikin fails to show how including funding for ATSDR's medical monitoring program in its budget request would result in the program actually being carried out, she has demonstrated neither causation nor redressability, and therefore, she lacks standing. We agree that Pritikin has failed to demonstrate the second and third prongs of the constitutional standing requirements and that we therefore lack jurisdiction over her claims.

### A. Causation

To meet the causation requirement, Pritikin's injury—her inability to receive medical screening—must be fairly traceable to DOE's failure to include funding for the Hanford medical monitoring program in its budget requests. It cannot be " 'the result of the independent action of some third party not before the court.' " *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130 (quoting *Simon*, 426 U.S. at 41–42, 96 S.Ct. 1917) (alterations omitted). By claiming that DOE's failure "to fulfill its obligation to fund the Medical Monitoring Program and the Exposure Subregistry Program" has deprived her of needed medical surveillance, Pritikin's claim presupposes that a budget request for funding would necessarily result in the funding and that if the funding were provided the program would necessarily begin. Thus, even at first blush, Pritikin's standing appears weak, as her theory omits a necessary step in the causation chain—the independent decision of ATSDR, a third party not before the court, to begin the medical monitoring program.

Pritikin argues that by failing to include the medical monitoring program in its budget request, DOE did not "take such steps as may be necessary to ... eliminate or substantially mitigate the significant risk to human health." 42 U.S.C. § 9604(i)(11).[8] According to Pritikin, this provision imposes an affirmative duty on DOE to provide ATSDR with the funding it needs to initiate the medical monitoring program before any costs have been incurred. Although this "duty" is without support in the text of CERCLA, Pritikin argues that her inability to obtain medical screening is "directly traceable" to DOE's failure to perform it. We disagree.

In *Simon*, indigents and organizations of indigents claimed the Secretary of the Treasury and the Commissioner of the Internal Revenue Service issued Revenue Ruling 69–545, which extended tax benefits to nonprofit hospitals that offered treatment to indigents on an emergency basis

---

8. 42 U.S.C. 9604(i)(11) requires the President to take "such steps," but the President delegated this responsibility to the executive department heads and granted them the authority to carry out the functions of Section 104. Executive Order 12580 section 2(k).

only, in violation of the Internal Revenue Code of 1954 and the APA. They argued that the ruling encouraged hospitals to deny service to the individual indigents and members of the indigent organizations. *Simon*, 426 U.S. at 33, 96 S.Ct. 1917. The Supreme Court disagreed, concluding that it was pure speculation as to "whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43, 96 S.Ct. 1917. The Court found it "equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to [the indigents] of such services." *Id.* at 43, 96 S.Ct. 1917. Because there was no evidence suggesting that the issuance of the ruling caused the hospitals to deny indigents treatment, *id.* at 28, 96 S.Ct. 1917, and because "unadorned speculation will not suffice to invoke the federal judicial power[,]" the Court held that respondents lacked standing, *id.* at 44, 96 S.Ct. 1917.

The need to speculate as to the causal link between the actions of the party being sued and the alleged injury arose because, like Pritikin, the *Simon* plaintiffs sued the wrong party: rather than suing the hospitals refusing indigents care, they sued the people responsible for promulgating the revenue ruling. Although the plaintiffs successfully alleged an injury, the Court reasoned an "injury at the hands of a hospital is insufficient by itself to establish a case or controversy in the context of this suit, for no hospital is a defendant." *Id.* at 41, 96 S.Ct. 1917. Here, Pritikin has not sued a party with the clear ability to act. Rather than suing the ATSDR, the party with the statutory power and duty to act, Pritikin has sued DOE, the party liable for "the costs of any health assessment or health effects study carried out...." 42 U.S.C. § 9607(a)(4)(D). Although she has

sufficiently alleged that she was injured by the failure to implement a medical monitoring program at Hanford, "[an] injury at the hands of [ATSDR] is insufficient by itself to establish a case or controversy in the context of this suit, for [ATSDR] is [not] a defendant." *See Simon*, 426 U.S. at 41, 96 S.Ct. 1917.

Similarly, in *Duquesne Light Co. v. United States Environmental Protection Agency*, 166 F.3d 609 (3d Cir.1999), the independent actions of a third party, not before the court, were at issue. The Third Circuit concluded that the Duquesne Light Company lacked standing to judicially challenge the EPA's approval of Pennsylvania's state implementation of the Clean Air Act. The utility company claimed that it lost emission reduction credits (ERCs) and faced higher operation costs as a result of EPA's approval. *Duquesne*, 166 F.3d at 612. The Third Circuit held that Duquesne's injury was "manifestly the product of the independent action of a third party—Pennsylvania's Department of Environmental Protection[,]" which redefined the state implementation plan "in such a way that Duquesne may not receive ERCs for its dormant plant." *Id.* at 613. This, in turn, reduced the number of ERCs Duquesne claimed it would have received had the less stringent requirements of federal law been applied. Because the Clean Air Act required the EPA to approve any state plan that met the minimum federal requirements, which Pennsylvania's plan did, the EPA did not have the power to change its decision or to order Pennsylvania to relax its clean air requirements. *Id.* Thus, the Third Circuit concluded that the EPA's approval of the Pennsylvania plan was not "fairly traceable" to Duquesne's injury. *Id.*

As in *Duquesne*, Pritikin's injury is "manifestly the product of the independent action of a third party." *Id.* Although

DOE is liable for "the costs of any health assessment or health effects study carried out under section 9604(i) of this title," 42 U.S.C. § 9607(a)(4)(D), ATSDR is responsible for implementing the program once it "has determined that there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances based on the results of a health assessment conducted under paragraph (6).... " 42 U.S.C. § 9604(i)(9). ATSDR is not required to wait for DOE's funding before beginning the Hanford medical monitoring program; it can seek an alternate source of funding. Thus, any failure to implement the medical monitoring program lies at the hands of ATSDR.

In a factually analogous decision, the Seventh Circuit held that the Area Transport did not have standing to challenge the Federal Transit Administration's (FTA) decision regarding the sanctions imposed on Mass Transportation Administration of Flint, Michigan (MTA) for simultaneously receiving federal grants and providing exclusive school bus service. *Area Transp., Inc. v. Ettinger*, 219 F.3d 671, 672–74 (7th Cir.2000). Area Transport argued that the FTA's ruling requiring MTA to cease providing illegal school bus services if it wished to continue receiving federal grants was too lenient, and requested that the court both declare MTA ineligible to receive future grants and compel FTA to order MTA to repay the grants illegally received. *Area Transport*, 219 F.3d at 672. Area Transport argued that it was injured by continued competition with MTA, which had an unfair advantage due to its illegal appropriation of funds. Because there was no information in the record that once the FTA issued its cease and desist order, MTA was still competing with Area Transport, Area Transport could not

show that imposing less harsh sanctions would improve competition between the two. *Id.* at 673. In response to Area Transport's argument that MTA would be competing with impermissibly fattened coffers, the Seventh Circuit observed "to the extent that such an outcome requires not only that MTA react to the FTA's cease and desist order by forgoing future federal grants in favor of continuing its school bus service, but also that MTA do so successfully, this scenario is both highly speculative and dependent on uncertain actions by MTA, who is not before us." *Id.* Thus, the Seventh Circuit held that there was no causal connection between the FTA's imposition of less harsh sanctions and the competitive injury suffered by Area Transport.[9] *Id.*

Pritikin faces similar causation problems. She cannot show that DOE's failure to request funding prevented ATSDR from implementing the medical monitoring program. ATSDR could have sought alternative funding sources, like Superfund, to begin the monitoring program. Thus, Pritikin's argument that ATSDR could not institute its medical monitoring program because it did not receive funding specifically from DOE "is both highly speculative and dependent on uncertain actions by [ATSDR], who is not before us." *See id.*

## B. Redressability

Many of the problems Pritikin encounters in establishing causation also affect her ability to demonstrate that a decision in her favor "will produce tangible, meaningful results in the real world"—or in other words—to establish that her claim is redressable. *Common Cause v. Dept. of Energy*, 702 F.2d 245, 254 (D.C.Cir.1983). As demonstrated above, this case is "one of third-party causation"—Pritikin "seeks

---

9. The court assumed, without deciding, that Area Transport successfully alleged a continu-

ing injury. *Area Transportation,* 219 F.3d at 673.

to change [DOE's] behavior only as a means to alter the conduct of a third party, not before the court, who is the direct source of [Pritikin's] injury." *See Common Cause*, 702 F.2d at 251. Thus, we must determine whether requiring DOE to include the Hanford medical monitoring program in its budget request will result in ATSDR's implementation of that program. We conclude that it will not.

The redressability issues here are analogous to those presented in *Lujan v. Defenders of Wildlife*, which set the standard for establishing constitutional standing when challenging the actions—or inactions—of federal agencies. In *Defenders of Wildlife*, the plaintiffs sought both a declaratory judgment that the Secretary of the Interior's regulation, which required federal agencies to consult with him about the effect of their actions only if they would affect endangered species in the United States or on the high seas, was too geographically narrow, and an order requiring such consultation for foreign actions. *Defenders of Wildlife*, 504 U.S. at 559, 112 S.Ct. 2130. Because other federal agencies were not bound by the Secretary's regulation, "the only injury in fact respondents complain of require[d] action ... by the individual funding agencies." *Id.* at 571, 112 S.Ct. 2130. Ordering the Secretary of the Interior to act would not remedy the plaintiffs' injury; thus the Court concluded that they lacked standing. *Id.* at 578, 112 S.Ct. 2130.

Pritikin attempts to distinguish her case from *Defenders of Wildlife* on three grounds. First, Pritikin argues that ATSDR, unlike the non-party agencies involved in *Defenders of Wildlife*, became statutorily bound to act once it found a "significant increased risk of adverse health effects." Thus, according to Pritikin, ATSDR would be required to implement the medical monitoring program if

the DOE requested and provided funding. In advancing this argument, Pritikin fails to consider one important fact: ATSDR is not bound by DOE's actions or decisions. ATSDR could choose to ignore its statutory duty and decline to implement a medical monitoring program even after DOE included funding for the program in its budget. Because ATSDR is not a party to this suit, we cannot prevent this from occurring, nor could we sanction ATSDR for statutory non-compliance if it chose not to implement the Hanford medical monitoring program. We simply cannot compel a nonparty in these circumstances to act, even if it would be in conformance with a statutory duty.

Next, Pritikin argues that *Defenders of Wildlife* is distinguishable through comparison of the respective economic impacts on the non-party agency of the party agency's action or inaction. Because DOE is fully liable for the costs of the medical monitoring program under CERCLA, Pritikin contends that DOE's budget request and funding will directly affect whether the medical monitoring program is initiated. By comparison, in *Defenders of Wildlife*, the Department of the Interior only supplied a fraction of the funding for foreign projects and therefore could not affect their outcomes by withholding funds. In advancing this argument, however, Pritikin overlooks an important fact: ATSDR could, for example, pursue other sources of funding, like Superfund, and later seek reimbursement from DOE. Such action would be fully consistent with the statute. Although DOE's decision to include medical monitoring in its budget could facilitate implementation of the program, there is nothing in the record that indicates that its decision not to include the program in its budget request prevented ATSDR from initiating the program at all. Of course, because ATSDR is not a party to this action, there is nothing in the record to

indicate what effect, if any, DOE's failure to budget for the program is having on its implementation.

Lastly, Pritikin submits that she is challenging a particular government decision, whereas *Defenders of Wildlife* involved a challenge to a generalized level of government action. While this may be factually true, this argument misses the mark. Whether the government's challenged action is specific or general does not—without more—demonstrate that the requested relief will redress the alleged injury.

As in *Common Cause*, Pritikin has failed to show how ordering DOE to request funding would lead to the tangible result of a Hanford medical monitoring program when only ATSDR has the power to actually initiate the program. In *Common Cause*, Appellants sought to force DOE to publish a final energy conservation plan for federally owned and leased buildings pursuant to 42 U.S.C. § 6361(a)(2). DOE had published a Preliminary Plan, but the Final Plan was delayed by problems with individual agencies. *Common Cause*, 702 F.2d at 248. Appellants sought publication of the final plan to reduce federal government energy consumption, which would alleviate the energy shortage and lower energy prices. *Id.* at 249. The D.C. Circuit concluded that Appellants lacked standing because they "utterly failed to indicate ... how a decree ordering publication of the Final Plan would be likely to lead to tangible additions in federal energy conservation above and beyond those currently being achieved under the regime of the Preliminary Plan." *Id.* at 252 (italics omitted).

That DOE is bound to act pursuant to 42 U.S.C. § 9604(i)(11) does not meet the constitutional standing requirements. Pritikin relies on *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("*TVA*"),[10] which held that the Endangered Species Act was violated when an agency failed to "take such action[ ] necessary to insure" its actions did not jeopardize an endangered species pursuant to 16 U.S.C. § 1536, *id.* at 188, 98 S.Ct. 2279, to establish that DOE violated § 9604(i)(11) by not taking "such steps as may be necessary to reduce such exposure and eliminate or substantially mitigate the significant risk to human health." Even if it were a necessary step for DOE to include a line item request for medical monitoring in Hanford, that responsibility alone does not provide the missing causal link between DOE's budget request and ATSDR's ability to implement the program Pritikin desires.

### V. Conclusion

Because Pritikin has not shown that her injury was "fairly traceable" to DOE's actions or that the relief she seeks will remedy that injury, we hold that Pritikin lacks standing to bring this suit, and we affirm the decision of the District Court.[11]

AFFIRMED.

---

**10.** *TVA* did not involve a standing challenge. In that case, a regional association of biological scientists, a Tennessee conservation group, and individuals citizens and users of the Little Tennessee Valley area sought an injunction prohibiting "the operation of a virtually completed federal dam" because, "pursuant to authority vested in him by Congress, the Secretary of the Interior [ ] determined that operation of the dam would eradicate an endangered species." *TVA*, 437 U.S. at 156, 161 n. 10, 98 S.Ct. 2279. The Court reached the merits of the case and enjoined the completion of the dam.

**11.** We do not address a question not before this court: whether Pritikin would have

standing if ATSDR were named as a party in this action.